James Crosby
February 07, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02502-RM-NRN
_____

DEPOSITION OF:  JAMES CROSBY - February 7, 2023
                (Via RemoteDepo)
_____

WENDY LOVE, JAY HAMM,

Plaintiffs,

v.

OFFICER MATHEW GRASHORN, in his individual capacity,

Defendant.
_____


        PURSUANT TO NOTICE, the deposition of
JAMES CROSBY was taken on behalf of the Defendant in
Jacksonville, Florida, via remote means, on February
7, 2023, at 11:00 a.m., before Tiffany D. Goulding,
Registered Professional Reporter and Notary Public
within Colorado, appearing remotely from Arapahoe
County, Colorado.

James Crosby
February 07, 2023

Page 2

1          REMOTE APPEARANCES
2   For the Plaintiffs:
3          SARAH SCHIELKE, ESQ.
           The Life & Liberty Law Office
4          1209 Cleveland Avenue
           Loveland, Colorado 80537
5          sarah@lifeandlibertylaw.com
6
     For the Defendant:
7
           JONATHAN ABRAMSON, ESQ.
8          Kissinger & Fellman, P.C.
           3773 Cherry Creek North Drive, Suite 900
9          Denver, Colorado 80209
           jonathan@kandf.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1               I N D E X
2   EXAMINATION OF JAMES CROSBY:              PAGE
     February 7, 2023
3
     By Mr. Abramson                            5
4
     By Ms. Schielke                          158
5
6
                                          INITIAL
7   DEPOSITION EXHIBITS:                   REFERENCE
8   (Exhibits provided electronically to the reporter.)
9   Exhibit 21  Plaintiffs' Affirmative Expert     11
                Disclosure Pursuant to Fed. R. Civ.
10               P. 26(a)(2)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4              *    *    *    *    *
5          THE REPORTER:  The attorneys
6   participating in this deposition acknowledge that I am
7   not physically present in the deposition room and that
8   I will be reporting this deposition remotely.  They
9   further acknowledge that, in lieu of an oath
10   administered in person, the witness will verbally
11   declare his testimony in this matter is under penalty
12   of perjury.  The parties and their counsel consent to
13   this arrangement and waive any objections to this
14   manner of reporting.
15          Please indicate your agreement by stating
16   your name and your agreement on the record.
17          MR. ABRAMSON:  Jonathan Abramson on
18   behalf of Officer Grashorn, and I agree.
19          MS. SCHIELKE:  Sarah Schielke on behalf
20   of the plaintiffs, Wendy Love and Jay Hamm, and we
21   agree.
22          THE REPORTER:  Mr. Crosby, I will ask you
23   to agree and declare that the testimony you are about
24   to give will be under the penalty of perjury.  Do
25   agree to that?

Page 5

1          THE DEPONENT:  Yes, I do.
2              JAMES CROSBY,
3   having verbally declared that his testimony in this
4   matter is under penalty of perjury, testified as
5   follows:
6              EXAMINATION
7   BY MR. ABRAMSON:
8      Q.   Okay.  Good morning, Mr. Crosby.  My name
9   is Jonathan Abramson.  I represent Officer Grashorn in
10   this lawsuit.  Can you state and spell your name,
11   please.
12      A.   Certainly.  It's James, J-a-m-e-s, middle
13   initial W, last name Crosby, C-r-o-s-b-y.  And I'm
14   going to apologize in advance if I look like I'm
15   looking away from you.  It's because I'm looking at
16   you on my screen and I don't want to seem rude.  But
17   the way things are set up, I can't see you and look at
18   the camera at the same time.
19      Q.   Okay.  What is your date of birth, sir?
20      A.   February 17 of 1958.
21      Q.   And have you had your deposition taken
22   before?
23      A.   Yes.
24      Q.   How many times have you had your
25   deposition taken before?

James Crosby
February 07, 2023

Page 6

1     A.   Since I became a police officer in 1977,
2  thousands of times.
3     Q.   Okay.  And so you had your deposition
4  taken in the capacity as a police officer?
5     A.   I've had my deposition taken in my
6  capacity as a police officer, in my capacity as an
7  animal control officer and supervisor, in my capacity
8  as a consultant, and in my capacity as an expert
9  witness within the United States, Canada, the United
10  Kingdom, and Australia.
11     Q.   Okay.  So I won't belabor the logistics
12  of a deposition, as you've testified thousands of
13  times.  Do you understand that I'll be asking the
14  questions and the court reporter will be taking down
15  your answers?
16     A.   Yes.
17     Q.   Okay.  You understand that for the court
18  reporter to properly record what transpires during
19  this deposition, you have to answer verbally and not
20  nod or say "uh-huh" or "huh-uh"?
21     A.   Yes, I understand.
22     Q.   Okay.  You understand that you're under
23  oath?
24     A.   Yes.
25     Q.   And that this is an official proceeding

Page 7

1  and carries the same weight as if you were testifying
2  in a courtroom?
3     A.   Yes.
4     Q.   And that failure to tell the truth is a
5  crime called perjury?
6     A.   Yes.
7     Q.   Is there anything that would interfere
8  with your ability in providing full and accurate
9  answers today?
10     A.   Not that I'm aware of, no.
11     Q.   Okay.  There's no -- you're not on any
12  medications or suffering from any mental or physical
13  issues which would impair your ability to give
14  truthful testimony today?
15     A.   No, I am not.
16     Q.   And if you don't understand one of my
17  questions, I'd ask you to please let me know.
18     A.   I will.
19     Q.   And if you answer my question, I will
20  operate under the assumption that you understand the
21  question.
22     A.   If I don't, I will ask you.
23     Q.   Okay.  How did you get involved in this
24  case?
25     A.   I was contacted by Attorney Schielke to

Page 8

1  examine the case and to -- if possible or if
2  appropriate to render opinions regarding my opinions
3  and assessment of the use of deadly force in this case
4  against a dog named Herkimer that occurred in
5  Loveland, Colorado.
6     Q.   And in addition to speaking with
7  Ms. Schielke, did you review any materials initially?
8     A.   Initially I looked at the initial video
9  and spoke with her a bit.  And when I realized that
10  this was a case that I could support from the
11  information I had at that time, the conclusion that
12  the use of deadly force was unnecessary in this case,
13  then I agreed to take the case as a full consulting
14  case.
15     Q.   Had you worked with Ms. Schielke before?
16     A.   No, I had not.
17     Q.   And you were subsequently retained by
18  Ms. Schielke?
19     A.   Yes, I was.
20     Q.   And what have you billed in this case?
21     A.   My fee in this case is a flat fee of
22  $5,000.
23     Q.   Does that include today's testimony?
24     A.   No.  You're billed for that.
25     Q.   Okay.  So you had a flat fee of 5,000 for

Page 9

1  reviewing the materials and composing your report?
2     A.   And for any further consultation back and
3  forth, for appearance at trial, if there is such an
4  appearance, with the exception that travel and lodging
5  would be billed on top of that fee.  So all advice,
6  information, and so forth between myself and
7  Ms. Schielke and her law firm is covered under that
8  flat fee regarding this case.
9     Q.   Has that been paid?
10     A.   I received 50 percent as a retainer; and
11  when this case is ultimately decided one way or the
12  other, then I will be paid the rest of the outstanding
13  balance.
14     Q.   Okay.  Is there a contract that supports
15  this agreement?
16     A.   Yes.  There is a letter of engagement.
17     Q.   Okay.  Has that -- is that in your file?
18     A.   I don't know.  I have a copy.
19  Ms. Schielke has a copy.
20     MR. ABRAMSON:  Okay.  Ms. Schielke, I'm
21  not sure that that has been produced.  I would ask
22  that that be produced.
23     MS. SCHIELKE:  Okay.  I'll take a look
24  and if we haven't sent it over, we'll shoot it to you.
25     MR. ABRAMSON:  I don't recall seeing it.

James Crosby
February 07, 2023

1    Q.   (BY MR. ABRAMSON) All right.  So,
2  Mr. Crosby, how do you find clients for your business?
3        A.   Clients find me usually by word of mouth.
4        Q.   Okay.  You don't advertise?
5        A.   No, I do not advertise.  I do not have an
6  active website presence.  It's word of mouth.
7        Q.   Okay.  Do you have any Facebook or any
8  social media presence?
9        A.   I have an account on Facebook that I post
10  on rarely and usually centers around family matters
11  and so forth.  I have a Twitter account that I post on
12  occasionally, very rarely anything of substance.  And
13  that's the total of my social media presence.  I don't
14  have Instagram or TikTok or whatever is going on these
15  days.
16        Q.   Do you have a blog?
17        A.   I did have a blog.  It has not been
18  updated in probably five years, maybe longer.  I'm
19  guessing around 2016 or '17 would be the last time I
20  posted to it.  I just didn't keep up with it because
21  it was extra work and I didn't need it for anything.
22  So I stopped.
23        MR. ABRAMSON:  Okay.  Tiffany, I have an
24  exhibit.  What would be the best way to get that to
25  you?

1        THE REPORTER:  You can either put it in
2  the chat or email it to me, whatever is easiest.
3        MR. ABRAMSON:  I'll put it in the chat.
4  So I just sent it in the chat.
5        THE DEPONENT:  I'm trying to open it
6  right now.
7        MR. ABRAMSON:  Let's -- I'm trying to
8  think where we left off on exhibits in this case.
9  Sarah, do you recall?
10        MS. SCHIELKE:  I don't, but I might be
11  able to figure it out really quick.  One second.  It
12  has to be 19 because I have 19 -- it looks like we're
13  at 21.
14        MR. ABRAMSON:  If we could mark this as
15  21.
16        (Deposition Exhibit 21 was remotely
17  introduced and provided electronically to the court
18  reporter.)
19        Q.   (BY MR. ABRAMSON) Mr. Crosby, so I don't
20  have to do a screen share, do you have that?  Can you
21  open that document, which is your expert report?
22        A.   Yes.  I've got it open.  I just want to
23  verify this is -- the title of the file is "221031 PI
24  Expert Disclosure (Crosby), dot, PDF, page 1 of 28."
25  Is that the same that you're looking at?

1        Q.   Yes, sir.
2        A.   Then we're on the same page.
3        Q.   All right.  So this includes what's filed
4  with the Court, which is the expert disclosure page,
5  but we're going to start at page 3 of the PDF, which
6  is the beginning of your report.
7        A.   I see that.
8        Q.   Okay.  Unfortunately, the report is not
9  page numbered.  So when I'm going to be referring to a
10  page number, it's going to be the total page number of
11  the document.  So the document, if you open it up in
12  Adobe, it should be 28 pages.  Is that what you're
13  seeing?
14        A.   Yes.  I show the opening page of my
15  report as page 3 of 28.
16        Q.   Great.  We're on the same page.  So this
17  is the report that I received in this case.  So let's
18  go to page 18 of your report.  Well, page 18 of the
19  PDF.
20        A.   The one that starts "Mr. Crosby has
21  extensive court experience" at the top?
22        Q.   Yes.
23        A.   I have that page.  Thank you.
24        Q.   So what is the director of canine
25  encounter training and Law Enforcement Center on

1  Animal Abuse?
2        A.   The National Law Enforcement Center on
3  Animal Abuse is an organization that's under the
4  umbrella of the National Sheriff's Association.  The
5  National Sheriff's Association several years back
6  contacted me and asked me to write a curriculum for
7  law enforcement officers teaching them basic dog
8  behavior, teaching them how to understand dog body
9  language, how to understand what dog aggression and
10  bites are, what function they fulfill and methods for
11  them to safely be able to avoid injury to themselves,
12  to the dogs, and to the public when in the various
13  situations they encounter such dogs.
14        As a result of that, I was given the
15  title of director of canine encounter training because
16  I was the author of the training, the primary person
17  putting the training together, and have been the
18  primary instructor for all such training done
19  underneath the umbrella of the National Sheriff's
20  Association.
21        Q.   Is that a paid position?
22        A.   No.  I was paid for the actual production
23  of the curriculum as a contractor to the National
24  Sheriff's Association to provide them with a product
25  that is theirs to do with as they wish.

James Crosby
February 07, 2023

1    Q.   How much of your time do you continue to
2  devote to that entity?
3    A.   Since COVID came up, very little.  The
4  only training I have done in the last year, for
5  instance, was to train the Miami-Dade Metro Police, to
6  train their training staff so that their own internal
7  staff could turn around and train the 6,000 officers
8  of the Miami-Dade Police Department.  I don't spend
9  very much time at all.  COVID pretty much shut down a
10  lot of in-person trainings and so forth.
11    Q.   Okay.  So have you updated your, I guess,
12  bio or CV since this was disseminated to us?
13    A.   Let me look at the bottom.  I think I may
14  have -- no.  This is through 2022, and I haven't taken
15  on any new cases in 2023.  So this is pretty much it,
16  other than the fact that I am further along in my
17  educational process, and today or tomorrow am turning
18  in the draft for my Ph.D. dissertation.
19    Q.   Okay.  And what school is that through?
20    A.   My Ph.D., as my master's was, is through
21  the College of Veterinary Medicine at the University
22  of Florida in Gainsville, Florida.
23    Q.   And what's your intent of getting that
24  degree?  What do you see as kind of the upside of
25  getting that degree?

1    A.   To continue to perform research as part
2  of the university to disseminate the information and
3  data that I have gathered and to positively affect
4  hopefully particularly the subject of dog bites, dog
5  aggression, and fatal dog attacks with the goal of
6  hopefully reducing the number of people killed at
7  least in the United States by dog attacks by
8  recognizing and analyzing the factors that go into
9  both nonlethal and lethal bites.
10    Q.   And so if you go to page 19 of 28, when
11  did you get your bachelor's degree?
12    A.   My bachelor's degree I finished back in
13  2008.  I had gone to college before I started my
14  police career, and then my college was interrupted for
15  a while.  I went back and got various classes along
16  the way and was finally able to assemble all those
17  credits and do some additional work and receive a
18  bachelor's degree from Charter Oak State College.
19    Q.   Where did you originally take college
20  classes?
21    A.   I started at Jacksonville University here
22  in Jacksonville, Florida, then went from there to Duke
23  University.  And then after Duke I filled in some
24  classes here at the University of North Florida.
25    Q.   Okay.  So when you graduated high school,

1  were you going to college full time?
2    A.   Actually, I graduated high school and I
3  was early admitted into college.  So I actually
4  graduated high school with a full year -- my full
5  freshman year of college behind me.  So I was going
6  full time at that point, yes.
7    Q.   To Jacksonville?
8    A.   Jacksonville University.
9    Q.   Okay.  And you transferred and were
10  admitted to Duke University?
11    A.   Yes, I was.
12    Q.   Okay.  And why didn't you finish Duke?
13    A.   To boil it down, I was 17 years old and
14  was, quite honestly, not mature enough to have been
15  dealing with higher education at the competitive level
16  of Duke University.  I gave it a shot.  I wasn't doing
17  very well.  So I dropped out, got a job, and had the
18  intent of going back and finishing later when I kind
19  of had grown up.
20    Q.   Did you voluntarily leave Duke or were
21  you disciplined or were your grades not sufficient?
22    A.   I voluntarily left Duke.  My grades were
23  not terrific.  I said I was 17 as a junior in college,
24  which was -- put it this way:  I would recommend to
25  parents don't let your children try and jump on ahead.

1  Let them mature as they should rather than being in a
2  hurry.
3    Q.   And then what did you do after leaving
4  college?
5    A.   I came back to Jacksonville, worked some
6  part-time jobs for a while for, I guess, about six
7  months.  Then I was accepted into what was called at
8  that time the law enforcement training program with
9  the Jacksonville Sheriff's Department.  Understand
10  that Jacksonville is a dual entity.  It is both a city
11  and a county consolidated.  So the police department
12  here is the city police, but it's also the sheriff's
13  office.
14    I was accepted into that.  I spent a
15  little over a year -- around a year in the training
16  program, was promoted into the police academy, and
17  started my full career as a sworn police officer,
18  which continued from 1970 -- let's see.  I went into
19  LET in '77.  I went through the academy in '78 and
20  retired with full completion and so forth as a
21  lieutenant in 1999.
22    Q.   And why did you leave the police
23  department?
24    A.   I was able to retire.  We have
25  fortunately a very good retirement system and at 41

James Crosby
February 07, 2023

1 and after 22 and a little bit years as a police
2 officer, I decided I wanted to do something different
3 and was gratefully able to do so.
4      Q.    And so why don't you explain to me what
5 your -- so the entity is your current -- do you have a
6 business name for -- one or more business names?
7      A.    I have a business name.  It is Canine
8 Aggression Consulting, LLC, which is registered with
9 the State of Florida.  It's based right here in my
10 home.  That is the -- for tax and deductions and all
11 of those wonderful things, that is the entity that I
12 consult under.  I am its sole member and employee.
13 And, yeah, that's the legal entity that is my work.
14      Q.    Okay.  So what does that entity do?  So
15 what types of projects?
16      A.    All centered around dog behavior.  I do
17 and have done for many years dog training.  I do dog
18 behavior consulting as far as working with behavior
19 problems.  I consult with veterinarians on both
20 behavior and in the last number of years forensic
21 issues.
22           I have been a certified animal control
23 officer and the chief of two different animal control
24 agencies and have, as a result of that and the
25 consulting work, taught animal control agencies across

1 the United States, across Canada, and multiple other
2 countries on the best practices and so forth of dog
3 bite investigation and also on dog aggression,
4 behavioral factors to dog bites and the behavioral
5 factors involved in dangerous dogs.
6           And that morphed into advising,
7 consulting with, and teaching law enforcement agencies
8 on best practices and safety measures for their
9 officers to deal with the many pet dogs that they
10 encounter during their duties.
11           I do dog bite legal consulting for
12 personal injury attorneys.  I have performed analyses
13 of dog bite -- or dog shooting situations for both
14 owners and for police departments and have also
15 consulted on canine deployment to identify which of a
16 couple of alleged options was most likely to have
17 occurred during an interaction with a suspect.
18      Q.    Have you ever been a canine officer?
19      A.    No.  I worked with them.  Especially as a
20 lieutenant, the officers wanted me to take over the
21 unit.  That did not work out, but although I've never
22 been trained as a canine handler, nor have I ever
23 qualified, I did attend their trainings and work with
24 them when I had the opportunity.
25      Q.    And so how -- if you can break down the

1 percentage of your -- of business of your entity.  So
2 how much is dedicated towards being an expert in legal
3 cases in lawsuits?
4      A.    Depends on how you break it down.  I do a
5 substantial amount of work with personal injury
6 attorneys, both for the plaintiffs and the defense, on
7 dog bite cases and analyzing the behaviors involved.
8           I do a lot of consulting with attorneys
9 and clients regarding dangerous dog cases, both
10 sometimes in support of the owner of the dog,
11 sometimes in support of the person who was threatened
12 or bitten.  I do a smaller amount these days with
13 police shootings.
14           Quite honestly, in the last few years,
15 the number of cases has slightly declined, which is
16 good.  I do a fair amount of training for both
17 behavior consultants and trainers and for police
18 officers on recognizing and dealing with dog behavior
19 and also on a fair bit of consulting with owners on
20 dogs who are presenting undesirable or potentially
21 dangerous behavior.
22      Q.    Yeah.  I guess my question was, have you
23 ever quantified the percentage of your work and your
24 income to these various things that your business
25 does?

1      A.    Of my total income, the Canine Aggression
2 Consulting part of my income only represents between
3 20, 25 percent of my income.  Most of my personal
4 income comes from my retirement as a police
5 lieutenant.
6      Q.    Okay.  I understand that.  So 20 percent
7 of your total income comes from this business you
8 have.  Of that, how much is from legal work, expert
9 work?
10      A.    Maybe half.
11      Q.    And the rest is --
12      A.    Teaching.
13      Q.    -- dog training?
14      A.    Teaching.  Dog training, teaching.  I do
15 a lot more teaching.  So teaching both in person and
16 online classes the principles of understanding dog
17 behavior, especially as it applies to aggression, dog
18 body language, and so forth.
19      Q.    So like in the last month, how much dog
20 training have you done?
21      A.    In the last month I have spent all of my
22 time doing my Ph.D. dissertation.
23      Q.    When was the last time you did dog
24 training?
25      A.    I consulted on probably half a dozen

James Crosby
February 07, 2023

Page 22

1    cases at various times of dog aggression and dog
2    attacks as far as the behavior goes over the last
3    year.  So probably half a dozen in the last year.
4        Q.    Do you do any kind of -- have you done
5    any kind of specialized training like Schutzhund
6    training or anything like that?
7        A.    I have done -- when I started dog
8    training, I trained dogs for field competitions and
9    hunters, primarily retrievers.  I have done obedience
10   training.  I have done a little bit of confirmation
11   showing, although I'm not very good at it.  I do not
12   do any Schutzhund, French rings, sport, or other
13   bite-work-oriented training at all.
14       Q.    Have you ever done any bite work
15   training?
16       A.    No, I have not.  Outside of the police, I
17   don't believe civilians need to have a biting dog.
18       Q.    Okay.  And you've never done any bite
19   work training for canine?
20       A.    Formally, no.  I did participate in some
21   of their training sessions when I could do so, but I
22   have not ever been certified or formally trained as
23   such.
24       Q.    Do you own dogs?
25       A.    Yes.  Right now I have three.

Page 23

1        Q.    What kind of dogs do you own?
2        A.    Well, we've got a miniature smooth-haired
3    Dachshund who's about six years old.  I've got a
4    seven-year-old curly-coated retriever, and I have
5    about a three-year-old rescue English Bull Terrier
6    with whom I am working for the purposes of improving
7    his behavior and eventually hopefully finding him a
8    forever home someplace.
9        Q.    Do you have any kind of, like, training
10   philosophy of any kind of literature, like the Monks
11   of New Skete?  Do you believe in that philosophy?
12       A.    There is a lot of popular dog training
13   material out there, most of which is not based in
14   science.  The Monks of New Skete, the gentleman out in
15   California, some of these TV trainers, a huge
16   percentage of that is not scientific.
17             I base my training on scientifically
18   validated theories and principles, most of which
19   revolves around the idea of setting the dog up to
20   succeed and then reinforcing or rewarding that
21   appropriate behavior while putting humane limits on
22   undesirable or inappropriate behavior.
23       Q.    Do you do any corrections in your
24   training?
25       A.    Correction is usually misunderstood.

Page 24

1    Correction is a process.  Correction is interrupting a
2    behavior, redirecting it to an acceptable and
3    incompatible behavior, and reinforcing that.  To drill
4    down, yes, I say no.  I do not believe that everything
5    is rainbows and unicorns.  Yes, I say no in a manner
6    that the dog understands and in a manner that is
7    humane and instructive, not punishing.
8        Q.    So I assume you don't support the use of
9    e-collars?
10       A.    When I first started training, I used
11   electronic collars and in fact I was -- when I was
12   competing in the field, I was actually on pro staff
13   for one of the manufacturers, a company called
14   Innotek.
15             As the time went by, I had a change in my
16   philosophy and realized that there were better ways of
17   doing things most all of the time.  There is still a
18   remote place for a punishment-type stimulus such as
19   something that needs to save the dog's life, but
20   typically there is another way of working.  And to
21   appropriately use electronic stimulus as a training
22   device, as one of the best-known trainers in the
23   country, a Dr. Ian Dunbar said, you have to understand
24   dog behavior to the point that you really don't need a
25   collar for that.

Page 25

1        Q.    Okay.  All right.  If you could turn to
2    page 23 of 28 of the PDF, which this is actually
3    numbered.  It's page 7 at the bottom.
4        A.    Yes, I see that.
5        Q.    So do you have any cases that need to be
6    added to this?
7             MS. SCHIELKE:  Object to form.  Go ahead.
8        A.    I don't think so.  I'm not sure if I
9    actually have this case written on here because it's
10   open and it hasn't been closed yet.  Typically I list
11   the cases once they are over and done with.  I know I
12   have one case that is open in federal court in
13   Louisiana regarding the New Orleans Police Department.
14   There is this case that's open.  And I believe I have
15   one further case that's open.  And I also have a case
16   that just contacted me literally yesterday on a dog
17   bite case.
18       Q.    (BY MR. ABRAMSON) So this New Orleans
19   case, what is that about?
20       A.    The New Orleans Police Department had one
21   of their officers that shot a pet dog, and the case
22   addresses whether his reaction, immediate use of
23   deadly force, was reasonable or not reasonable.
24       Q.    And did you issue a report in that case?
25       A.    The report is actually due next week.

James Crosby
February 07, 2023

1    Q.    Okay.  So you haven't been deposed in
2  that case?
3    A.    Not yet, no.
4    Q.    Okay.  So you're offering an opinion
5  against the New Orleans Police Department officer;
6  correct?
7    A.    That is correct.  I traveled to New
8  Orleans and attended the necropsy, or autopsy for
9  humans, of the dog and built an opinion based on the
10  physical evidence and the statements and video.
11    Q.    What kind of dog was that?
12    A.    It was a mixed breed.
13    Q.    Okay.  Could you tell any of the breeds
14  that it was a mix of?
15    A.    No, because visual identification has
16  been shown -- original identification of breed has
17  been shown to be extremely inaccurate.  The dog is
18  probably one that your average person might call a pit
19  bull mix or might not.  I don't know what its genetic
20  makeup is.
21    Q.    Okay.  And so the rule -- the federal
22  rule actually provides that you list all cases in
23  which you've been deposed or provided trial testimony.
24  So is there anything on this list -- you mentioned
25  that you don't list it unless the case is closed.  Are

1  there any cases where you've been deposed but the case
2  remains pending?
3    A.    Not right now, no.  Again, during the
4  COVID period, there were a lot of hearings that
5  weren't taken care of and there were fewer cases that
6  came up.  So there's nothing on here for which I have
7  not either been -- well, have not been deposed and
8  either the case was settled thereafter or we went to
9  trial and the case is settled now.
10    Q.    Okay.  When was the last time you had
11  your deposition taken?
12    A.    I'd have to look at my calendar.  It's
13  probably been before Christmas.
14    Q.    What case was that on this list?
15    A.    That would probably -- that would be --
16  the San Diego Animal Services I know was before
17  Christmas.  Lavergne, the deposition would have been
18  late last year, but the settlement has been since
19  that.  So the settlement would have been and it would
20  have closed in early 2022.  I'm sorry.  We're in 2023
21  now.  So in 2022 Lavergne and Tinsley in early '22
22  both would have had depositions and they both were
23  disposed of during 2022.
24    Q.    Okay.  So let's take a look at this.  So
25  James -- so Tinsley versus City of Las Vegas -- North

1  Las Vegas, is a lawsuit that you gave a deposition
2  testimony in; correct?
3    A.    Correct.
4    Q.    And what was that case about?
5    A.    It was about the City of North Las Vegas
6  SWAT team shooting and killing the plaintiff's dog.
7    Q.    Okay.  What kind of dog was that?
8    A.    A lab mix.
9    Q.    Okay.  And so you testified that that
10  shooting was unjustified?
11    A.    Correct.
12    Q.    And you may have said this.  Is that case
13  still pending, to your knowledge?
14    A.    No.  I believe we settled -- that was
15  settled during 2022.
16    Q.    Do you know what the settlement was?
17    A.    I believe it was confidential.  I don't
18  have the figure for it.
19    Q.    What about Lavergne versus The Princeton
20  and Excess Lines Insurance for the parish -- Rapides
21  Parish Sheriff's Department?
22    A.    That was where the Rapides Parish
23  Sheriff's Department entered a residence and shot and
24  killed the dog that belonged to the Lavergnes.  Again,
25  that was a settlement for which I was not provided a

1  dollar figure due to conditions of the settlement.
2  The dog in that case was a Boxer-ish mix.  It was not
3  a purebred dog.
4    Q.    And you testified that that was not
5  justified as well?
6    A.    That's correct.
7    Q.    What about, moving up, Villar versus City
8  of San Diego Animal Services?
9    A.    That was a case wherein the animal
10  services officers were out on -- I believe it was the
11  5 freeway and used very poor judgment in deploying
12  their vehicle and blocking traffic, which resulted in
13  a traffic crash that killed one of the passengers in
14  the car and seriously injured three others.
15    Q.    So what capacity did you testify in that
16  case?
17    A.    I testified as to the best practices and
18  procedures of animal control officers, having run two
19  agencies, and the fact that the officers were
20  needlessly chasing a stray dog through rush hour
21  traffic on a busy California highway and placed -- by
22  not following their own rules, placed the public in
23  extreme danger.
24    Q.    Okay.  And so you testified that this was
25  kind of overall improper animal control practices?

James Crosby
February 07, 2023

Page 30

1    A.   Yes.
2    Q.   What about this Ruslander versus Randolph
3  Towers Condominium Association?
4    A.   That was the owner of a dog in a
5  condominium complex.  The dog was being walked and
6  another dog broke loose and attacked the dog and also
7  injured the owner of the first dog.
8    Q.   Okay.  So who did you testify on behalf
9  of?
10   A.   I testified on behalf of the bitten party
11  that the other party had not followed best practices,
12  had not addressed behavioral warnings that their dog
13  had given, and that the bitten party and her dog were
14  merely peacefully walking down the shared stairway
15  between apartments when the other dog, who had a
16  history of bites and had a history of issues, was
17  improperly restrained and attacked her and her dog.
18   Q.   So that was a personal injury suit?
19   A.   Yes.
20   Q.   Okay.  And you provided testimony on
21  behalf of the defendant who was bitten?
22   A.   It was actually the plaintiff who was
23  bitten.  I'm sorry.  I looked -- it's the defendant
24  who was bitten.  Yes.
25   Q.   Okay.  So you were hired --

Page 31

1    A.   So, yeah, the defendant was being
2  attacked and tried to be evicted by the condominium
3  association claiming that as the victim of this dog
4  attack, her dog was somehow dangerous.
5    Q.   So you were hired by the insurance
6  company in that case?
7    A.   I was hired by her counsel.  I'm not sure
8  if he was working for the insurance company or who.
9    Q.   Okay.  And then moving up to 2020,
10  Paradise Island Property versus George?
11   A.   That was another case where a -- Paradise
12  Island Property was a trailer park.  They were trying
13  to evict the owner, first and last name George, from
14  the property claiming their dog was dangerous.  And I
15  was testifying that the behavior of the dog owned by
16  the Georges was not such that met the standards for
17  being declared a dangerous dog or even particularly
18  hazardous.
19   Q.   Okay.  So this Vaseleros-Stevenson versus
20  Calvert County, what was that case about?
21   A.   Vaseleros versus Calvert County,
22  Maryland, let me -- I'm honestly trying to remember.
23  It's been a few years.  And between the cases I've
24  dealt with and being eyeballs deep in my doctoral
25  research, I honestly don't off the top of my head

Page 32

1  remember.  It was a police shooting.
2  Vaseleros-Stevenson was the plaintiff in the case.
3  And beyond that, right now I'd have to look it up.  I
4  have no idea.
5    Q.   Okay.  And what about Meer versus Erie
6  County?
7    A.   That was upstate New York and Meer, Meer,
8  and Meer were family members.  And, again, at this
9  point, I don't recall the exact case.  I think it
10  had -- well, I don't recall the details of the case.
11  Again, if you want to look it up --
12   Q.   Here you have "plaintiff police
13  shooting."
14   A.   Right.
15   Q.   So was that kind of a similar capacity to
16  the current case where you're representing the dog
17  owner whose dog was shot?
18   A.   Yes.  That would have been why I was
19  retained, was because of the circumstances of the
20  shooting.
21   Q.   Okay.  So for 2020 are there any other
22  cases where you testified in that capacity against a
23  law enforcement entity who shot and killed a dog?
24   A.   That was not.  That was not.  No, none
25  that I remember.  I've got these on the list.  And I

Page 33

1  don't recall any other cases that would have closed
2  out in 2020 that involved a dog shooting, no.
3    Q.   What are these two Douglas County cases
4  in Colorado, Jensen and McAfee?  Do you recall?
5    A.   They were both dog bites.  They were both
6  cases where Douglas County, Colorado, had declared the
7  dogs dangerous.  And in Jensen I disagreed with the
8  county's dangerous dog declaration of a particular
9  dog.  That wound up being decided by the Court in
10  favor of Douglas County.
11        And to be perfectly honest, I found out
12  afterwards that the client and others involved had
13  misrepresented the case, and if I had had all the
14  information up front, I would not have been giving the
15  opinion that I did.  McAfee v. Douglas County, that
16  was a minor dog bite that, again, I disagreed with the
17  findings.  And in that case the dog was found not to
18  be dangerous.
19   Q.   Okay.  So I'm going to ask you the same
20  question for 2019.  Look at those cases and tell me
21  which, if any, of those cases involve testimony
22  against a law enforcement entity that shot a dog or
23  shot and killed a dog.
24   A.   In Zorich v. Zavorka and St. Louis County
25  police, that was a shooting by the St. Louis County

James Crosby
February 07, 2023

Page 34

1  police.  And the award was in favor of the plaintiff,
2  who I was working for.  And that award was $750,000 in
3  liability against the St. Louis County Police
4  Department.
5        Other than that, Azurdia versus the City
6  of New York Police Department, that was a -- I was on
7  the plaintiff's side.  They sued the City of New York
8  Police Department and were awarded a significant
9  high-five-figure award from the New York Police
10 Department.  I think I was told a number, but I'm not
11 sure if I'm allowed to share it.
12        Q.   Okay.
13        A.   But it was high five figures.  Azurdia
14 was a shooting by NYPD of a pet dog.
15        Q.   And what kind of dog was that?
16        A.   That was a medium-sized brown dog.  I
17 don't think it had a particular breed.  If I remember
18 correctly, it was a stray adopted from the New York
19 City Animal Care and Control some years before.
20        Q.   Zorich, was that a trial or a settlement?
21        A.   Zorich versus Zavorka, actually we went
22 completely through trial and the morning just before
23 final arguments the St. Louis County Police
24 Department's attorney came to the attorney that I was
25 working with and they offered Ms. Zorich $750,000 to

Page 35

1  not go before the -- to not go to the jury.
2        They accepted that, as estimates at the
3  time were that it was going to be well into seven
4  figures; but as you're probably aware, district courts
5  sometimes uphold cases and alter monetary awards.  So
6  the attorney's judgment at that point was to accept
7  750,000.
8        Q.   You testified in trial in that case?
9        A.   Yes, I did.  I was deposed and then
10 testified in trial.
11        Q.   In that case do you know if the sole
12 issue was the dog or were there other Fourth Amendment
13 issues in that case?
14        A.   The major issue was the dog, although
15 there were some other issues such as the grounds for
16 the search warrant and other procedural defects in the
17 case.
18        Q.   What about -- looks like in 2018 there
19 were less cases.  Were any of those involving a
20 shooting of a dog by a law enforcement entity?
21        A.   Yes.  The first two cases were both in
22 Nevada and both, once again, in the North Las Vegas --
23 in fact, they both involved the North Las Vegas Police
24 Department.  In Wheeler v. City of Henderson, the city
25 of Henderson was the primarily liable party because

Page 36

1  they had deployed or had deployed the North Las Vegas
2  Police Department SWAT team in the case.
3        Walker was, again, the North Las Vegas
4  SWAT team that was within the jurisdiction of North
5  Las Vegas.  So that was handled as it's listed.  And
6  one case the SWAT team shot a dog in a neighboring
7  yard that they didn't even have contact with,
8  apparently to shut the dog up so it didn't bother the
9  protection officer who was perched on top of a 10-foot
10 wall behind the adjoining property.
11        Q.   I'm sorry to interrupt.  That was the
12 Wheeler case?
13        A.   That was -- yeah, that was Wheeler.  I'm
14 sorry.  I believe that one was Wheeler.  Walker was
15 one where they entered a property.  The two dogs that
16 were present ran from them and the SWAT team officers
17 chased the dogs down between the house and a fence,
18 shot one as it was running away between the house and
19 the fence, then chased the other dog into a corner of
20 a garage and shot that dog multiple times as it was
21 trying to get away from them.
22        Other than that, in 2018 the other cases
23 were not involving police shootings.  They were one
24 dog bite that was nonfatal and one fatal dog attack
25 and one case that was criminal homicide.

Page 37

1        Q.   What about the 2017 cases?  Any of those?
2  Looks like the Almendarez versus Hollywood, Florida,
3  case is a police shooting.
4        A.   Yes.  Almendarez versus the City of
5  Hollywood was a police shooting.  In that case the dog
6  was fleeing from an area where the officers were
7  executing a search warrant.  In that case I was hired
8  by the plaintiff.  The federal court in the Hollywood
9  district court down there found in favor of the defendant.
10 Ian Anderson versus San Diego --
11        Q.   Let me stop you there.  So the Hollywood
12 case, at trial they found in favor of the defendant or
13 in a preliminary motion, if you know?
14        A.   If I recall correctly, it was -- I had
15 given a deposition, but I believe it may have been
16 during summary judgment, if that can be done after a
17 deposition.  I was deposed, but -- again, I'm not sure
18 which set of motions, but it was -- the action was
19 denied by the court.
20        Q.   Okay.  It looks like Ian Anderson versus
21 San Diego -- in San Diego, that's not the same Ian
22 Anderson of Jethro Tull, is it?
23        A.   No.  As far as I know, this Mr. Anderson
24 does not play the flute, although I would have been
25 happy to have met the Mr. Anderson that does.

James Crosby
February 07, 2023

Page 38

1  Honestly, looking at that, other than the fact that I
2  was hired by counsel for the plaintiff, I don't
3  remember a thing about it at this point.
4       Q.   Okay.  Then it looks like another police
5  shooting on behalf of a plaintiff, which is Bonnie Lee
6  versus Kern County Probation Department.
7       A.   Right.  That involved a probation officer
8  who entered into the property of Bonnie Lee.  We did
9  go to depositions.  There were mistakes made.  I don't
10  remember what the amount was, but the settlement was
11  in favor of Ms. Lee.  We didn't actually go to trial.
12       Q.   All right.  And then for 2016, any cases
13  involving -- it looks like this Marquez case versus a
14  Pleasant Hill police officer?
15       A.   Right.  There was also -- the last case
16  there was Bryan and Katherine Thomas versus the
17  Sheriff of Palm Beach County.  That was dismissed in
18  summary judgment.  Marquez versus Robinson in
19  California, again, I'd have to look that one up.  I
20  honestly don't remember.
21            Spokane County Sheriff's Department,
22  police shooting, that was a canine handler or was that
23  the other one?  I believe that was where a canine
24  handler shot a client's or another person's dog, and
25  that one was settled after deposition without going to

Page 39

1  court.
2       Q.   Okay.
3       A.   You didn't just lose my video, did you?
4       Q.   No.
5       A.   There I am.  I heard a funny noise and
6  wasn't sure if it was something.  If that happens,
7  please let me know because sometimes I have to unplug
8  the camera and replug it back in.
9       Q.   Okay.  So Branson versus Commerce City,
10  that was also in Colorado?
11       A.   Yes.
12       Q.   You issued a report and were deposed in
13  that case?
14       A.   Yes.  I issued a report.  I was deposed.
15  And the settlement of $263,000 was made in favor of
16  the plaintiff.
17       Q.   In that case the officer was also charged
18  criminally?
19       A.   Yes, he was.
20       Q.   Did you testify in the criminal
21  prosecution as well?
22       A.   No.  Unfortunately, I was brought in
23  after the initial criminal prosecution was completed.
24       Q.   Do you remember who the attorneys were in
25  that case?

Page 40

1       A.   Commerce City and Moore v. City of Erie,
2  Colorado and Fisher v. Adams were all a former
3  attorney by the name of -- oh, god, what was her name?
4  I'll think of it in just a second.  She is no longer
5  counsel.  Her name -- well, she was arrested and sent
6  away for hiring somebody to murder her husband.  So
7  she's no longer practicing law.  Jennifer Emmy.
8       Q.   So those three cases were with Jennifer
9  Emmy?
10       A.   Correct.
11       Q.   So tell me about the Moore case.  What
12  was that about, if you remember?
13       A.   Moore was a case where a dog named Ava, a
14  German Shepherd, had come outside and was -- an
15  officer yelled at the dog, the dog started running,
16  and the officer shot her from behind.  Fisher happened
17  around -- it was a dog that was shot by the police.
18  The officer was responding to a silent alarm in a
19  storage, one of those mini storage facilities.  And
20  instead of following procedure and waiting with the
21  other eight or nine officers that were on scene, he
22  jumped the fence, went in there, a dog came running
23  around a corner, and he shot it.
24            The Branson versus City of Commerce City,
25  that was a case where a dog was standing in an open

Page 41

1  garage.  On video they had an animal control officer
2  and another officer there with catchpoles.  They
3  managed to get the dog on the catchpole, had the dog
4  under control, and for some reason the shooting
5  officer decided to -- as the animal control officer
6  was taking the dog towards where the truck was parked,
7  the officer found for some reason necessary to open
8  up, fired six shots at the dog, hit him, I believe,
9  five times and put one round in the animal control
10  officer's truck.
11       Q.   Okay.
12       A.   That, again, was -- that was settled
13  again for $263,000.
14       Q.   What was the result of the Moore case, if
15  you know?
16       A.   Moore was a settlement for the plaintiff
17  from the City of Erie.  And I don't remember what it
18  was.  The Moore and Fisher were both in the $50,000
19  range.
20       Q.   And then I guess lastly we have 2014, and
21  it looks like there's two police shooting cases?
22       A.   Three.
23       Q.   Oh, all three of them are.  Okay.  So
24  what do you recall of Moses Lake?
25       A.   Moses Lake was -- it's been so long ago,

James Crosby
February 07, 2023

Page 42

1  I don't remember the particulars.  I do know that the
2  case had been -- in, like, 2012 had been -- excuse me
3  one second -- dismissed by the Court.  The attorney
4  refiled the case.  The Court accepted the refiling.
5  We went to trial and at trial the case was found in
6  favor of the plaintiff.
7          Gonzales v. City of Pico Rivera, I don't
8  remember.  It had something to do with a gang unit,
9  but I don't remember the details of that one.  And
10  Russel and Hope Lane v. City of Round Rock, I gave a
11  deposition in that, but the attorney for whom I was
12  working made some procedural errors and did not meet
13  deadlines and as a result of their malpractice the
14  case was dismissed.
15      Q.  Okay.  And so in that Moses Lake did you
16  testify in trial?
17      A.  Yes, I did.
18      Q.  Okay.  All right.  So we've been through
19  kind of your list of testimony since 2014.  And we
20  went through, would you agree, probably over 20 cases
21  in which you've testified for the plaintiff against a
22  law enforcement entity involving the shooting of a
23  dog?
24      A.  I would say that that's a rough estimate,
25  yeah.  And in most of the cases that have gone this

Page 43

1  far, I have testified for a number of plaintiffs, yes.
2      Q.  Okay.  Have you ever testified or offered
3  an opinion on behalf of a police officer who shot a
4  dog?
5      A.  Yes.  I have done several, but in those
6  cases we never went to the level of actually taking
7  depositions or going to trial.  There have been
8  several cases also that plaintiffs have contacted me
9  and asked me to take cases against police departments,
10  and I've looked at the basics and have not even begun
11  the process because I could see that in those
12  particular cases the officer was clearly justified and
13  had perfectly good reason to use deadly force in
14  those.
15          There have been a selection of those.  I
16  probably should -- I don't keep records of those
17  because if the case is that clear, I don't take it.
18  If the officer, you know, is clearly, unquestionably
19  in the right, I'm not -- I don't feel comfortable
20  wasting my time or taking a client's money when I know
21  that the officer was right.  As a retired officer, if
22  the officer is right, I'm going to stand behind him.
23      Q.  When was the last time you -- I
24  understand you didn't go to deposition, but you were
25  hired by a police department or law enforcement entity

Page 44

1  to issue an opinion regarding a shooting of a dog?
2      A.  I was hired to investigate the shooting
3  of a dog in Nevada and that was -- gosh, I'm trying to
4  recall -- 2019, 2018, 2019.  The civil case came
5  later.  The sheriff of Nye County, Nevada, had met me,
6  asked me to come investigate a case by one of her
7  officers at her request.  I did.
8          My opinion was the officer was at fault.
9  And with the sheriff, her whole operation, I then
10  trained her entire department on better methods of
11  dealing with the situation.  There was a civil case
12  filed later that -- although my reports and trainings
13  and so forth were part of that, I was not retained by
14  the plaintiff, but instead in depositions simply
15  testified to what I had done, what my opinions were.
16  And, again, my presence there was at the request of
17  the sheriff of that county.
18      Q.  Okay.  So in that case you found that the
19  officer was unjustified?
20      A.  Right.  I found -- and that was -- my
21  findings wound up being the same as the shooting
22  review board that was conducted by the department, but
23  I didn't know about their investigation until after I
24  had already rendered my opinion.  And myself, the
25  sheriff, and their review board all concurred that

Page 45

1  this was an issue.
2      Q.  Can you tell me a case where you issued a
3  report or an opinion where you found that an officer
4  shooting of a dog was justified?
5      A.  I have not issued any such reports
6  because the times I've been contacted, again, by
7  clients and the police officer was justified, I've
8  told them, I'm not going to testify for you; I am no
9  good for you; I think this officer was perfectly
10  justified.
11          Police departments don't tend to reach
12  outside very often for an exterior opinion, but
13  usually go with in-house people.  So none of them --
14  other than Nye County and, as I said, there was a case
15  where I looked at a canine officer's deployment as far
16  as the bite, the police departments don't tend to
17  call.  And when they have called, they don't tend to
18  want to pay.  They'd rather do it in-house.
19      Q.  So I think we can take a break in a
20  minute, but I just want to clarify, you've never
21  issued a written report saying that an officer
22  shooting of a dog was justified?
23      A.  I've never had the opportunity, no.
24          MR. ABRAMSON:  Okay.  All right.  Well,
25  we've been going for a little bit.  Why don't we take

James Crosby
February 07, 2023

Page 46

1 a ten-minute break, then we'll continue.
2          (Recess taken, 12:14 p.m. to 12:28 p.m.)
3      Q.   (BY MR. ABRAMSON) So, Mr. Crosby, you
4 understand you're still under oath?
5      A.   Oh, yes.
6      Q.   Do you know if your opinions have ever
7 been excluded or limited by any court?
8      A.   They have never been excluded by any
9 court. I have been directed as to what parts of the
10 testimony I could give and what parts of the question
11 I was asked were matters of fact to be determined by a
12 jury. That's the only times I've been excluded from
13 testifying. And I wasn't excluded. Again, it was a
14 question was asked. Opposing counsel objected. The
15 judge ruled that whatever the question was was a
16 matter of law to be decided by the jury and directed
17 me not to answer.
18      Q.   So are you aware of any cases -- and this
19 is using kind of legal jargon -- of what's called a
20 Daubert challenge or a Rule 702 challenge have been
21 sustained involving you?
22      A.   No, they have not.
23      Q.   You're not aware of any?
24      A.   No. I'm aware there have been several
25 Daubert challenges and Rule 707 issues, and I have

Page 47

1 never been excluded based on such a challenge.
2      Q.   Okay. Are you aware -- Mr. Crosby, your
3 video is gone.
4      A.   I'm listening. I should have -- I'm
5 plugging it back in now. It's a camera. The
6 manufacturer says it's a software issue. It's like,
7 that's fine, but please fix it. Okay. I should be
8 coming back up now.
9      Q.   There you go. Are you -- what are the
10 cases you can recall where you were instructed not to
11 answer certain questions?
12      A.   I don't really --
13          MS. SCHIELKE: Sorry. Object to form.
14      Q.   (BY MR. ABRAMSON) Go ahead.
15      A.   I don't really recall any specific cases
16 that that happened. Again, it would have been
17 something where, for instance, as a hypothetical, an
18 attorney asked me did I think something was reasonable
19 and opposing counsel interrupted and objected that
20 reasonable was something that's found by the jury and
21 the judge would have said, Okay, you cannot use the
22 word "reasonable" because that's a legal conclusion.
23      Q.   Okay. There are certain things that
24 happen in cases that you may not be aware of. Were
25 you aware that your opinions were limited in the

Page 48

1 Zorich versus St. Louis case?
2      A.   No, I don't recall being told that. I
3 went to trial and testified and answered questions I
4 was asked. So I'm not up on that. Sorry.
5      Q.   Okay. Do you remember the Lane versus --
6 you mentioned a Lane versus Round Rock case?
7      A.   Yes.
8      Q.   So the motion for summary judgment was
9 granted in that case -- were you aware of that? -- in
10 favor of the defendants?
11      A.   I don't know how the process went. I
12 know that the attorney that had retained me failed to
13 communicate with the defendant on -- with the
14 plaintiff on a number of occasions. There was some
15 issues where he had raised some money supposedly, but
16 there were questions on that and there were questions
17 that deadlines and so forth weren't met. So I'm not
18 really sure where in the process the Court finally got
19 tired, if that's the right word for it, got tired of
20 that particular attorney's stuff and dismissed the
21 case.
22      Q.   What about the Bletz versus Quarry case?
23 Were you aware that that case was -- summary judgment
24 was granted in favor of the defendants?
25      A.   Bletz versus Quarry? When was that?

Page 49

1 That's not Bletz versus anyone. I don't recall a
2 Bletz case. Can you tell me what year or what case
3 was?
4      Q.   2020, and it was actually affirming it on
5 appeal. So it may have actually been an older case
6 because cases take a while to get to appeal. It was
7 in Pennsylvania. Ring a bell? Against Trooper
8 Quarry.
9      A.   I don't remember having a case against a
10 Pennsylvania trooper. I remember there was one in
11 West Virginia, but I don't recall a case in
12 Pennsylvania at all.
13      Q.   Okay.
14      A.   Sorry. I don't know.
15      Q.   All right. So back to your Exhibit 21,
16 which is your CV and your report, if you will look at
17 page 4 of -- actually, let's go to the bottom of
18 page 3 of 28 of your qualifications. You directly
19 investigated human fatalities by dogs with on-scene
20 investigation. When was the last time you did one of
21 those?
22      A.   The last case I responded to, there was
23 one in Macon, Georgia, in, I think, '21 or '22. Let
24 me look real quick, see if I've noted it. '13, '14,
25 '19, '21. Let's see. Crawford County, Georgia, was

James Crosby
February 07, 2023

1  2020.  There was one just outside of Macon since then.
2  And I can look up what the date of the last one from
3  my database is, which would tell me.
4        Q.   If you can explain the dynamic.  So your
5  LLC gets hired by someone to come look at -- help
6  investigate, or explain it to me.  How does that work?
7        A.   It depends on the case.  For instance,
8  there was a case I worked in Colorado.  There was a
9  human fatality.  The sheriff's office that responded
10 found the decedent's body.  The body had been -- had a
11 number of apparent dog bite injuries to it.
12       They had dogs there, but they didn't
13 really know exactly what they had, whether it was an
14 accident, a homicide or whatever.  Since there were
15 dogs involved, they called the state animal control
16 officer out.  The animal control officer, just like
17 the sheriff's office, had never seen a dog fatality,
18 but she had been through one of my classes.
19       So very shortly thereafter, they flew me
20 out to Colorado.  I looked at the scene.  I evaluated
21 for dogs involved.  I went to the medical examiner's
22 office and with the medical examiner went over the
23 decedent's body, collecting photographs and images of
24 the bite marks and looking at various things.
25       And what we were able to determine was

1  that the victim of this had been the victim of blunt
2  force trauma that broke her lower jaw on one side.
3  She was then strangled.  That was due to bruising we
4  were able to find in the tissues around the neck and
5  petechiae in the sclera, or white part of the eyes,
6  which is indicative of trying to breathe against the
7  severe restriction.  And then she was beheaded, and
8  then the dogs attacked her body and also -- not to be
9  gross, but essentially played with her decapitated
10 head, biting it and throwing it around like a dog toy.
11       Q.   Okay.
12       A.   In other cases I've found -- especially
13 earlier in my research, I've heard about the cases.  I
14 contacted the animal control or police departments.
15 Knowing that I was former law enforcement, they
16 allowed me to come up.  I've been able to assist them
17 by doing behavior evaluations on the many dogs
18 involved in these to see the crime scenes, to go over
19 medical examiner pictures, to talk with the medical
20 examiners and so forth.
21       So some, especially early on, a number of
22 cases I did out of pocket.  Some I've been paid more
23 recently to go to, and some that are fairly -- that
24 have been fairly close, for research purposes, I've
25 been willing to just simply go and provide opinion and

1  assistance where I can.
2        Q.   So you kind of follow the news and use it
3  for your studies of public stories about dog
4  aggression; is that fair to say?
5        A.   I do follow media reports in my -- for my
6  dissertation I've analyzed over 500 media reports.
7  And in addition to that, there are 37 cases in which I
8  was physically on scene or directly involved with the
9  investigation.  And I've evaluated 57 dogs that were
10 involved in those cases through personal contact,
11 behavioral evaluations and so forth.
12       Q.   I'll just ask you about a couple recent
13 ones just in the last couple months.  A couple weeks
14 ago in Georgia an 11-year-old boy's scalp was ripped
15 off with while riding his bike and attacked by three
16 pit bulls in Georgia.  Is that a case that you
17 followed?
18       MS. SCHIELKE:  Object to form.
19       A.   I'm sorry.  Go ahead.
20       Q.   (BY MR. ABRAMSON) Go ahead.
21       A.   I gathered the media reports on it.  I
22 did not go on scene on that one.
23       Q.   Also last month a seven-year-old girl
24 died in Baton Rouge after a pit bull attack.  That was
25 a few weeks ago.  Is that one that you did any

1  investigation in or followed any media on?
2        MS. SCHIELKE:  Object to form.
3        A.   I collected the media reports.  I have
4  not been directly in contact with any of the parties
5  out there.
6        Q.   (BY MR. ABRAMSON) Also last month a pair
7  of pit bulls got into a Missouri school playground and
8  injured 18 students and three teachers in the attack.
9  Is that something you followed?
10       MS. SCHIELKE:  Object to form.
11       A.   I remember noticing that there were
12 multiple people injured by dogs of some sort.  None of
13 them were injured fatally.  So I did not follow up any
14 more on it.
15       Q.   (BY MR. ABRAMSON) Okay.  In November, a
16 couple months ago, in Washington, D.C., a baby was
17 mauled by a pit bull and expected not to survive.  Did
18 you follow that one?
19       MS. SCHIELKE:  Object to form.
20       A.   I was aware of that situation and
21 recorded the media reports on that.  I did not
22 personally come in contact with anybody or go up to
23 D.C. for that.
24       Q.   (BY MR. ABRAMSON) Okay.  Also last month
25 a man in South Africa was mauled to death by his pit

James Crosby
February 07, 2023

1  bulls.  Is that something you followed?
2          MS. SCHIELKE:  Object to form.
3      A.  I am aware of the dog attack in South
4  Africa.  You keep referring to pit bulls, though, and
5  I have no positive identification as far as breed on
6  any of the cases that you have mentioned or indeed on
7  an awful lot of the over 500 cases that I've gathered
8  the data on for my research.  Breed identification is
9  an entire other subject that if you wish to go on we
10  will, but as far as labeling a dog as a pit bull,
11  that --
12      Q.  (BY MR. ABRAMSON) I understand you
13  disagree with that, but I'm just telling you what's
14  been reported.
15          MS. SCHIELKE:  You need to let him finish
16  his answer, Jonathan.
17      A.  It's not a scientific identification.
18  And so if somebody tells me they have a pit bull,
19  great, I'll call it a pit bull.  If they say it's a
20  left-handed tavern truffle hound, great.  I'm not
21  going to argue with somebody as to what they claim
22  their dog is.  The identification of breed is highly
23  problematic.  And there are studies that have shown
24  that scientifically.  So, yeah, call them whatever you
25  want.  Call them George.

1      Q.  (BY MR. ABRAMSON) And then a couple weeks
2  ago in Arkansas what was reported -- I understand your
3  issue with the pit bull characterization -- what was
4  reported to be a pit bull attack on a man involving
5  serious injuries, were you aware of that one?
6      A.  I was aware of an attack on a man in
7  Arkansas that did not prove to be fatal, but again,
8  because my research focuses on fatalities, I will
9  often note that there's been a bad attack and kind of
10  keep my ear open to see if there's more information
11  provided that the person has expired, but if it's not
12  a fatality, I don't devote as much attention to it.
13      Q.  Okay.  And so do you look at any kind of
14  statistics on fatalities?
15      A.  Actually, yes, I do.  And that has been a
16  significant part of my research and the dissertation,
17  and have found that an awful lot of the statistics
18  range from slightly off base to completely made up.
19  The reliability of statistics over time has, for a
20  number of reasons, been problematic, and that's part
21  of what my Ph.D. research has illuminated.
22      Q.  And so I happen to read a statistic
23  looking at the last couple years, and you may disagree
24  with it.  I'll just ask you that.  62 Americans and
25  three Canadians were killed by dogs in 2022?

1          MS. SCHIELKE:  Object to form.
2      A.  I would have to look through my database
3  because there are various parties who identify
4  dog-bite-related fatalities in various different ways.
5  For instance, if as happened in a case I directly
6  investigated in the state of Washington, a person
7  was -- the victim was bitten on the end of a finger.
8  It was a very small nick.  However, that person was
9  immunocompromised and went septic and died five days
10  later.  Because that injury is a direct result of the
11  physical contact with the dog, then that is one that I
12  record as a dog-bite-related fatality.
13          However, if somebody -- and there are
14  cases of it where they have significant cardiac
15  disease.  They get bitten by a dog.  They recover from
16  the dog bite, and yet weeks later they die and the
17  cause of death from the medical examiner is listed as
18  myocardial infarction and the associated factors
19  around that.
20          I don't list that as a dog-bite-related
21  fatality.  I can't guess that that person would or
22  would not have suffered the same myocardial infarction
23  that they did whether the dog was present -- whether
24  the dog bite ever occurred or not.  So that's one of
25  the problems with the statistics.

1      Q.  (BY MR. ABRAMSON) Well, does that sound
2  outlandish to you, 65 for 2000 -- does that sound
3  totally off base?
4      A.  65 is awfully high.  I believe that
5  the -- I can give you a quick number here.  You're
6  talking about '22 or '21?
7      Q.  '22.
8      A.  '22.  Okay.  I have recorded one, two,
9  three, four, five, six, seven, eight, nine, ten, 11,
10  12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 --
11  I've recorded 25 fatalities by dog bite within the
12  United States in calendar year 2021.
13          Now, it's always possible I've missed a
14  few, but one of the things I have found during
15  research is, for instance, the claim will be made that
16  a person died of a dog bite fatality in a certain
17  place on a certain day, and yet in researching it
18  there's no record from police departments or animal
19  controls or media that such an attack actually
20  occurred.
21          And in some cases the only thing I've
22  been able to find is somebody on Facebook or another
23  crowd-funding site asking for funeral donations for
24  someone that can't even be verified.  So 65 or 63 is
25  awfully high and is probably not correct.

James Crosby
February 07, 2023

1    Q.   Okay.  And so the same -- I'll just read
2  it and you can disagree, that of the 65, pit bulls
3  accounted for 40 of the 65 dog attack deaths in 2022.
4  Do you believe that to be incorrect?
5         A.   That opens up a whole bunch of other
6  problems.  What is the definition of a pit bull?  If
7  they're claiming that 40 of these alleged 60-some-odd
8  attacks were by registered American Pit Bull Terriers,
9  I can tell you that that is almost certainly a false
10 fact.  I would be surprised if more than one or two
11 were.
12        If they were to tell me that 40 dogs kind
13 of sort of looked to somebody like they might belong
14 within the mixtures and types of dogs that people may
15 call pit bulls, that's hard to say.  It could be true,
16 but understand there's a whole group of dogs that are
17 lumped together as pit bulls, everything from Presa
18 Canarios and Concursos to actual pit bulls to
19 Staffordshire Terriers to Bull Terriers to German
20 Shepherd/Labrador mixes, to all kinds of things.  It's
21 to the point where using a breed description for a dog
22 involved in fatal or nonfatal attacks is pretty
23 useless.
24        Q.   Okay.  Just a couple more cases to see if
25 you're familiar with.  This involved an animal control

1  technician in October in Los Angeles.  It was reported
2  that a pit bull attacked an animal control officer.
3  Is that a case that you're familiar with?
4         MS. SCHIELKE:  Object to form.
5         A.   Was it a fatality?
6         Q.   (BY MR. ABRAMSON) No, it was not a
7  fatality.
8         A.   Then, again, I don't keep up with all of
9  the nonfatal attacks.
10        Q.   Okay.  So also in October, we're talking
11 within the last few months, in Memphis a baby and a
12 toddler were killed and their mother was seriously
13 injured by their pet pit bulls in the Memphis area.
14 Is that a case that you followed?
15        MS. SCHIELKE:  Object to form.
16        A.   Yes, it is.
17        Q.   (BY MR. ABRAMSON) Did you do any kind of
18 investigation in that case?
19        A.   Other than simply seeing the media
20 reports and seeing some video footage and photographs,
21 I was not directly involved in it.
22        Q.   Okay.  There was one in Colorado a couple
23 months ago in Golden, Colorado, where an 89-year-old
24 woman sustained injuries that she died of from a pit
25 bull attack.  Is that one that you followed?

1         MS. SCHIELKE:  Object to form.
2         A.   I do recall an 89-year-old woman who was
3  killed in Golden, Colorado, on September 14, 2022.
4         Q.   (BY MR. ABRAMSON) Okay.  Then a little
5  over a year ago -- and she ended up miraculously not
6  dying, but a woman in Dallas whose face was ripped off
7  and her nose was ripped off by an attack of a couple
8  dogs, including a pit bull, is that one that you
9  followed?
10        MS. SCHIELKE:  Object to form.
11        A.   I do remember hearing about a dog bite
12 incident that resulted in very serious facial injury
13 in Texas.  I'm not sure if it was Dallas or Fort Worth
14 or where.
15        Q.   (BY MR. ABRAMSON) Okay.  So back to your
16 report, you stated that Herkimer was a mixed-breed
17 pup?
18        A.   Yes.
19        Q.   When you looked at the photos, what kind
20 of dog did it look like to you?
21        A.   Well, I'm looking at a photo of him right
22 now that is mostly brown with white shoulders and
23 white forepaws and some white on his face and a brown
24 spot on the side of his face and brownish ears and a
25 white splash on his back and white on his legs.  And

1  so he's very clearly a mixed breed.
2         And due to the inaccuracy of visual
3  appearances, I don't know what he is.  He could be a
4  Boxer mix.  He could have some kind of bully breed in
5  him.  He could be any of a number of things.  There's
6  no way to identify and to put a breed on him.  He
7  looks a little bit like just a bigger version of a
8  Jack Russell Terrier that I used to have.
9         Q.   Okay.  Did you ever look at the
10 transcripts of the plaintiff's deposition in this
11 case?
12        A.   I don't think I have.  I have the
13 officer's deposition transcripts, but I don't believe
14 I have the -- I don't recall if I have the transcript
15 from the plaintiff.  I'd have to look through my files
16 here for the file that contains that.  Let me look.
17        I've got a couple screens going here.
18 That's the police report.  That's the deposition from
19 the officer.  Policies and procedures.  Okay.  I have
20 the deposition of Mathew Grashorn.  I don't see the
21 deposition or anything that's labeled the deposition
22 of the plaintiff.  Let me look under one more thing.
23 I have city defense materials.  I have an amended
24 complaint, but I do not see a transcript of the
25 deposition of the plaintiff, no.

James Crosby
February 07, 2023

Page 62

1      Q.   Okay.  And so if one of the plaintiffs
2   described Herkimer as a pit bull or a pit bull mix, do
3   you have reason to disagree with that?
4           MS. SCHIELKE:  Object to form.
5      A.   I'm not going to argue with somebody over
6   what they think their dog is.  So we're just -- I'm
7   not going to sit there and criticize them, especially
8   with a mixed breed that even professionals can only
9   identify predominant breeds about 26 percent of the
10  time.  I'm not going to argue with somebody about what
11  they call their dog.
12     Q.   (BY MR. ABRAMSON) Do you ever use the
13  term "pit bull" or because of the issues you have with
14  it, do you refuse to use it?
15     A.   No.  If somebody says, Hi, this is my pit
16  bull, I may say, That's a nice looking pit bull.  If
17  I'm working a dogfighting case where I have pedigreed
18  fighting dogs that have been seized as part of illegal
19  dogfighting and we can document what they are, then I
20  will certainly call those pit bulls, because breed is
21  determined by pedigree, not by what they look like.
22     Q.   Do you do that -- so if you have a case
23  involving a Golden Retriever and you've been around a
24  lot of dogs and it looks like a Golden Retriever, do
25  you use the term "Golden Retriever" or only when

Page 63

1   seeing their pedigree?
2      A.   I will -- if it looks like a Golden
3   Retriever and the owner tells me it's a Golden
4   Retriever, even if it's not a very nice Golden
5   Retriever, I'll say it's a Golden Retriever.  Again,
6   I'm not going to argue with what somebody calls their
7   dog.
8      Q.   Okay.  Have you ever read any case law
9   regarding a court's determination of the propriety of
10  an officer shooting a dog?
11     A.   How do you mean?  I've seen cases where
12  officers have been found to have been justified and
13  unjustified.  So I'm not sure what you're driving at
14  there.
15     Q.   Have you looked at a court's analysis of
16  determining whether an officer was justified in
17  shooting a dog?
18     A.   I have seen various court decisions and
19  different courts have made different analyses.  I
20  don't think we have, unfortunately, a consistent
21  analysis even in -- sometimes even across federal
22  districts.
23     Q.   Okay.  Have you heard of a Graham versus
24  Connor analysis?
25     A.   Yes.

Page 64

1      Q.   What's your understanding of the Graham
2   versus Connor analysis?
3      A.   If I recall correctly, Graham v. Connor
4   was the situation that officer's use of deadly force,
5   and this particularly applied to a human case, was
6   determined to be extremely fluid and evolving and that
7   the decision the officer made had to be made from the
8   information that was presented and available to the
9   officer at the time without the benefit of hindsight.
10     Q.   Have you read any court decisions
11  regarding the propriety of an officer shooting a dog
12  that one of the factors is the breed of the dog?
13     A.   There have been a scattering of such
14  opinions that have seemed to have been based on either
15  incomplete or incorrect myth and bad information that
16  I have seen.
17     Q.   Okay.  So you disagree that the breed of
18  the dog, the size of the dog should factor into the
19  analysis of the reasonableness of an officer's
20  actions?
21          MS. SCHIELKE:  Object to form.
22     A.   The breed of a dog, unless you're at a
23  dog show or something, can't be accurately determined.
24  So we do not consider breed.  Size of a dog may be a
25  consideration.  If I have a 200-pound dog versus a

Page 65

1   2 1/2-pound dog, then it's only logical and reasonable
2   that the 200-pound dog probably has a much bigger
3   mouth and can therefore make a much bigger hole if it
4   bites me than the 2 1/2-pound dog.
5          So size, yes, would be something that a
6   prudent person should consider as to the response to
7   it, and that is something that I teach in the law
8   enforcement dog encounter training, that size does
9   matter.
10     Q.   (BY MR. ABRAMSON) You would agree that a
11  documented pit bull -- I understand you disagree with
12  many uses of the term "pit bull," but a documented pit
13  bull you would agree is capable of killing a human?
14          MS. SCHIELKE:  Object to form.
15     A.   Based on direct knowledge and research,
16  everything from a Great Dane to a Pomeranian is
17  capable of killing a human and has done so.
18     Q.   (BY MR. ABRAMSON) Okay.  Let's just say a
19  large dog.  You would agree that a large dog is
20  capable of causing severe injury to a human?
21     A.   I would say that any dog is capable of
22  causing an injury to a human and that a large dog, due
23  to their size, is probably going to cause more injury
24  than a tiny, little dog.
25     Q.   Would you agree that -- let's just say a

James Crosby
February 07, 2023

Page 66

1  Mastiff is probably more likely to be able to kill
2  someone versus a Bichon Frise?
3       A.   Not necessarily.  And that's not how it
4  breaks out.  Remember, fatal dog attacks are
5  extraordinarily rare.  They're one out of many, many,
6  many, many thousands of dog bites where somebody
7  actually dies.  No police officer has died from a dog
8  attack since 1932.
9       Q.   Okay.  Would you agree that a Mastiff is
10 more likely to cause serious injury to someone by
11 biting someone than a Bichon Frise?
12            MS. SCHIELKE:  Object to form.
13       A.   If all factors were the same and the
14 Mastiff was biting just as hard as the Bichon, then
15 the Mastiff would, because of their larger mouth,
16 cause a bigger injury, yes.
17       Q.   (BY MR. ABRAMSON) Because of just the
18 geometry and the crush space; is that fair to say?
19       A.   Sure.  It would be like if I hit you with
20 a full size baseball bat or one of those little toy
21 baseball bats they sell at the ballpark.  The big
22 baseball bat is going to cause a bigger ding if I
23 swing both of them equally hard.
24       Q.   Okay.  So you were with one police
25 department your entire career; is that correct?

Page 67

1       A.   That is correct.
2       Q.   And you were last a police officer in
3  1999?
4       A.   Yes.  I retired in 1999.
5       Q.   Did Jacksonville -- I want to use -- is
6  it commonly referred to as Jacksonville sheriff or
7  Jacksonville Police Department?  I know you said it's
8  a city and county.
9       A.   It's the Jacksonville Sheriff's Office.
10 Instead of having a chief of police, we have an
11 elected sheriff under whom there are appointed chiefs.
12       Q.   Is there still no Jacksonville Police
13 Department?
14       A.   No.  We are the Jacksonville Police
15 Department.  And, for instance, my warrant card or
16 certification is as both a deputy sheriff and a
17 municipal police officer.
18       Q.   Got it.  So 24 years ago in Jacksonville,
19 was Jacksonville using a use-of-force matrix or
20 continuum?
21       A.   Yes.  We were taught -- and I don't
22 remember exactly which of many terms that have been
23 used over the years we were using at the moment.
24 Use-of-force matrix, use-of-force continuum,
25 use-of-force scale, those are all terms that over the

Page 68

1  22-plus years I was there had been through the
2  industry.
3       Q.   Do you know if they're still using that
4  same matrix or continuum today?
5       A.   As best I know, they're still using
6  similar gradations.  As a retired officer, I have to
7  requalify with my firearm every year.  And with my
8  familiarity with every qualification process they're
9  still using, again, I'm not sure which instructor and
10 which term they're using right now.
11       Q.   So when you say "requalify," why would
12 you do that?
13       A.   Because as a retired police officer,
14 under federal law I am legally authorized to carry a
15 concealed firearm anywhere within the United States.
16       Q.   And you do that to keep up on your
17 certification?
18       A.   Right.  I don't typically carry a firearm
19 anymore, but I do keep my certifications up.
20       Q.   Do you have to go to the range to qualify
21 as well?
22       A.   Yes.  We have to go out to the range, and
23 it's a couple-of-hour process where they brush us up
24 on the latest use-of-force policies and how it might
25 affect us.  And then we go out and have to achieve a

Page 69

1  qualifying score with the firearm that we're going to
2  carry so that we can be certified with that firearm.
3       Q.   Is it a general use-of-force class or
4  just use of force related to use of a firearm?
5       A.   It's restricted pretty much to the use of
6  the firearm, because as retired officers I don't think
7  anybody would be carrying around a taser or OC or
8  whatever.
9       Q.   All right.  So other than this
10 use-of-force training specific to a firearm, when was
11 the last law enforcement training you received on use
12 of force?
13       A.   The last actual given-by-law-enforcement
14 use-of-force training I would have received would have
15 been pretty close to immediately before my retirement
16 in 1999.
17       Q.   Okay.  And so in '99 was Jacksonville
18 using tasers?
19       A.   Yes.
20       Q.   Or now they're called something
21 different, but yeah.
22       A.   Conducted electrical weapons.
23       Q.   Right.  It's a different company.  It's
24 not called taser.  Were you certified in a taser?
25       A.   No, I was not.  As a lieutenant in middle

James Crosby
February 07, 2023

1  management, they were still working their way through
2  everyone.  So I had not yet been through the actual
3  taser course.
4       Q.    Okay.  When was the last training you
5  received in officer safety?
6       A.    I haven't been to any -- other than
7  conferences and so forth -- for instance, the National
8  Sheriff's Association Conference -- I haven't actually
9  sat in a police department classroom getting police
10  department-mandated training since I retired.
11       Q.    Okay.  Same question with OC spray, when
12  was the last training you received in OC spray?
13       A.    OC spray would have been about 2008
14  because OC is recognized as effective and useful by
15  the National Animal Control Association, and so as
16  part of the National Animal Control Association and
17  the Florida Animal Control Association certification
18  as an animal control officer, I received training in
19  that.
20       Q.    And that's when you were working as the
21  head of animal control; correct?
22       A.    Yes.
23       Q.    Okay.  Did the animal control officers
24  under your supervision all carry OC spray?
25       A.    The ones in west Florida, they had it

1  available to them.  Not all of them had been through
2  the certification.  So most of them did here in
3  Jacksonville running this department.  Yes, all of
4  those officers did carry OC.
5       Q.    So you mentioned the National Sheriff's
6  Association conference you go to?
7       A.    Yes.  I don't go to all of them, but I've
8  been to several of them.  And I'm on the National
9  Sheriff's Association President's Committee on Animal
10  Abuse.
11       Q.    Okay.  So when was the last sheriff's
12  association you went to?
13       A.    Probably three years ago because -- and
14  that one would have been -- the things I attended
15  would have been remote, done online because of COVID.
16       Q.    And what conference was that?  Is that
17  the annual conference?
18       A.    It was their annual conference, and the
19  last one I went to was the one in New Orleans.
20       Q.    And what subject matters are presented at
21  those?
22       A.    They have all kinds of police-related
23  issues, everything from use of force at various times
24  to animal cruelty investigations to personnel problems
25  to new tools that are available to court decisions,

1  search and seizure.  It's all over the place.
2       Q.    Okay.  So other than the National
3  Association of Sheriffs, are you a member of any other
4  law enforcement associations?
5       A.    I am a life member of the Fraternal Order
6  of Police.
7       Q.    Do you go to the FOP conferences or
8  events anywhere?
9       A.    I'll go to occasional meetings or events
10  here.  I don't go to particularly the conferences.  I
11  don't know if you'd call it law enforcement or not,
12  but I do belong to the National Animal Control
13  Association, which is -- you know, animal control is
14  kind of an enforcement model.
15            And I have been to and taught at both the
16  National Animal Control Association conferences and
17  the Florida Animal Control Association conferences.
18  And I've worked with -- I think I may have been a
19  member of CAACO, Colorado Association of Animal
20  Control Officers, but I don't think I am now.  I think
21  because I was teaching out there, they let me join for
22  the moment or whatever it was.  I don't recall.
23       Q.    Okay.  Would you agree that best
24  practices in law enforcement has changed in the last
25  25 years?

1            MS. SCHIELKE:  Object to form.
2       A.    Yes.
3       Q.    (BY MR. ABRAMSON) And I'm sorry.  Your
4  answer was yes?
5       A.    Yes, it's changed.
6       Q.    All right.  What did you do to prepare
7  for today's deposition?
8       A.    Read over my report, looked back and
9  watched the videos from the body camera -- body-worn
10  cameras, looked at the images that I had pulled from
11  the body-worn camera footage, looked at the
12  statements -- or the deposition transcript of Mathew
13  Grashorn, looked at the report provided by this
14  officer -- I'm trying to find his name -- this Major
15  Ijames, Major Steve Ijames, spelled I-j-a-m-e-s, from
16  Springfield, Missouri police, looked over the Loveland
17  police reports, looked over the policies and
18  procedures that I've been provided by counsel
19  regarding the Loveland, Colorado, policies and
20  procedures about use of force and use of deadly force
21  with animals.  So basically looked over most of the
22  material.
23       Q.    Okay.  Did you meet with Ms. Schielke?
24       A.    I spoke with Ms. Schielke today to have
25  her resend me a Zoom link and I spoke to her yesterday

James Crosby
February 07, 2023

1  to make sure that I was ready and was looking over the
2  information to prepare for today.
3      Q.  Did you speak with anyone else in
4  preparing for your deposition today?
5      A.  No.
6      Q.  All right.  We looked at your report,
7  which is Exhibit 21.  Do you have any corrections or
8  revisions to that report?
9      A.  Off the top of my head, I did not see
10  anything that I had been provided, any information or
11  evidence that would change the opinions I expressed in
12  that report, no.
13      Q.  I want to go to your report.  So on
14  page 6 of 28 of the PDF, you have a list of materials
15  examined.  Do you have anything to add to that list
16  that you've received subsequent?
17      A.  Let me see.  In that list, discovery
18  packages, body camera footage, transcript of Mathew
19  Grashorn, veterinary documents.  No.  I believe that
20  all of the documents that I have are either listed
21  specifically there or listed as -- or are part of, for
22  instance, CITYDEFS 001 through 0018 and the various
23  labels on that.  I have not received anything that is
24  not contained in that descriptive list.
25      Q.  Is there anything in your file that

1  you've reviewed to prepare your report that isn't
2  listed there?
3      A.  Other than just simple personal
4  experience and the outside research that we all use
5  to, you know, establish our opinions and so forth, no.
6  The material applying to this particular case is
7  contained within that list.
8      Q.  Okay.  Let's talk about outside research,
9  because as part of this deposition we issued a
10  subpoena for you to produce your file.  So I'm trying
11  to get an idea of what research you relied on in
12  forming your opinions.
13      A.  I don't think you wanted the entire
14  bibliography of 200 articles that I use for my Ph.D.,
15  the entire bookshelf of reference books that have
16  something to do with dog behavior or dog bites or the
17  transcripts or articles of the hundreds of articles
18  that I've read about dog behavior and dog bites.
19  That's just simply part of what makes me, me.
20      Q.  Okay.
21      A.  I mean, I could drown you in tons of
22  paperwork that wouldn't tell you anything more or less
23  than I'm telling you now.
24      Q.  Is there anything specifically you used
25  in your report, any kind of reference or treatise

1  or --
2      A.  My experience in these cases and the
3  knowledge I've accrued over the years, the trainings
4  and classes I've attended that go everywhere from
5  forensic wound analysis to forensic behavior analysis
6  to use of OC and certification in chemical weapons
7  back when I was a police officer, there's nothing
8  specific that I would refer to.
9          There's not a textbook I've listed in
10  here.  There's the publications I have written,
11  including the chapters in the book on dog bites and
12  the law enforcement dog encounters training and the
13  master's thesis and the other things I've written
14  which contain a whole lot of references all by
15  themselves.
16      Q.  Okay.  Did you ever speak to the
17  plaintiffs in this case?
18      A.  No, I have not.
19      Q.  And obviously you never met Herkimer or
20  evaluated Herkimer?
21      A.  No, I did not.
22      Q.  And you haven't met any of plaintiffs'
23  other dogs; correct?
24      A.  No, I have not.
25      Q.  Did you ever visit the location where

1  this occurred?
2      A.  No.  I have not visited the location
3  there in Colorado.
4      Q.  I just didn't see it on your report.  Did
5  you listen to the 911 recordings in this case?
6      A.  I did.  It's been a while since I've
7  listened to that.  And actually, was there 911
8  recordings?  I do remember listening to the radio
9  chatter from the body-worn cameras.  I don't recall
10  whether there was -- I don't recall whether there
11  was -- yes, I do recall there was a 911 call from --
12  if I remember correctly, it was from the person who
13  owned the property that was watching through a remote
14  camera.
15      Q.  So you believe you listened to that?
16      MS. SCHIELKE:  Sorry.  I'm going to
17  object to form as to the characterization as a 911
18  call.
19      Q.  (BY MR. ABRAMSON) So you listened to
20  that?
21      A.  I listened to an audio recording between
22  a dispatch center and somebody who I later was told
23  was involved with the property.
24      Q.  Okay.  Did you -- I think you reviewed
25  veterinary records; is that correct?

James Crosby
February 07, 2023

1  A.  Yes.

2  Q.  Did you ever speak to any of the

3  veterinarians?

4  A.  No.

5  Q.  And you never spoke to any City of

6  Loveland personnel --

7  A.  No.

8  Q.  -- in this case?

9  Are you familiar with the Loveland Police

10  Department?

11  A.  I have no personal knowledge or have

12  never had contact with it, no.  I've driven through

13  Loveland once or three or four times, maybe.  I think

14  the major highway going north and south goes through

15  Loveland, if I'm not mistaken, through Denver.  So

16  I've been in the area, but I do not know anybody with

17  the Loveland Police Department, nor have I had any

18  contact with them.

19  Q.  Okay.  You've never been involved in any

20  cases before involving Loveland?

21  A.  Not that I recall, no.  I don't think any

22  of the cases that I recorded in my CV were with

23  Loveland.  They were with other cities in the area,

24  although I don't know what that -- I don't know what

25  county Loveland is in.  So I don't know if the one

1  that had -- there was a Fisher versus Adams County.  I

2  don't know if Loveland is Adams County.

3  Q.  No.

4  A.  Okay.  Then no.

5  Q.  You're not a veterinarian?

6  A.  No, I'm not.

7  Q.  You've never been a veterinarian?

8  A.  No, I have not.

9  Q.  Okay.  And the last time -- let me strike

10  that.

11  So in Colorado we have what's called POST

12  certification, you know, which is the certification

13  that every police officer has in Colorado.  Do you

14  have something similar in Florida?

15  A.  Yes.  We have -- it's not POST.  Florida

16  is the only state that doesn't use POST.  The

17  certification of police officers and curriculums and

18  so forth is managed by FDLE, the Florida Department of

19  Law Enforcement, but yes, I am familiar with POST, as

20  I've worked with several POST agencies, including

21  produced training for the Commission on Peace Officer

22  Standards and Training in California.

23  Q.  So this Florida, you said it's the F -- I

24  better write that down.

25  A.  FDLE, the Florida Department of Law

1  Enforcement.  One of the things they do is oversee the

2  certification of sworn officers in the state.

3  Q.  All right.  So you were last certified by

4  the FDLE in 1999; correct?

5  A.  My certification with FDLE would have

6  expired in 2003, because they're good for four years

7  after you retire.

8  Q.  Okay.  And you have not recertified under

9  FDLE or any other state's version of POST?

10  A.  Not as a police officer, no.  I've

11  certified as an animal control officer, but that's

12  different.

13  Q.  Yeah.  And that was kind of my next

14  question, is are there states where animal control

15  officers are also POST certified?

16  A.  To the best of my knowledge, no, because

17  animal control officers are typically not sworn police

18  officers.  There are some departments, for instance,

19  here in Florida where certified POST or FDLE sworn

20  police officers also conduct animal control duties.

21  That varies across the country, but it's not the most

22  common.

23  Q.  And that wasn't the animal control agency

24  that you worked for in Florida; correct?

25  A.  No.  Neither of the animal control

1  agencies here in Florida had any sworn police officers

2  in their employ.

3  Q.  All right.  So how many years were you a

4  patrol officer in Jacksonville?

5  A.  I was assigned -- other than a few little

6  short being-loaned-out things, I was assigned to the

7  patrol division from 1977 to 1999.  I was a patrol

8  officer.  I was a sergeant for ten years, about, and I

9  was a lieutenant for about six years.  So other than,

10  again, a couple of short-term assignments to

11  particularly work with narcotics when I was young, I

12  spent my entire career within the patrol division.

13  Q.  All right.  And so what years were you a

14  sergeant?

15  A.  So let's see.  I believe I was promoted

16  to sergeant in -- let's see.  My older daughter was

17  born in '87.  So right around 1987.  I'm sorry.  It

18  would have been before that.  Well, probably '86 or

19  '87 I would have been promoted to sergeant because it

20  was close to ten years.  And then I was a sergeant

21  until -- I think '92 I got promoted to lieutenant and

22  then was lieutenant until I retired.

23  Q.  Did you ever seek any position higher

24  than lieutenant?

25  A.  The department -- I would have been open

James Crosby
February 07, 2023

Page 82

1  to such an advancement, but while I was a lieutenant
2  the sheriff's administration changed and although I
3  had planned to take a captain's exam, they did away
4  with examination for any further promotion.  And as
5  such, it was all political appointments after that.
6  So I was never involved in trying to play politics.
7      Q.   Were you ever sued during your career in
8  law enforcement?
9      A.   I believe, if I remember correctly, in
10 probably 1979 I believe I was named in a suit against
11 the city because a person that was highly intoxicated
12 that I arrested sued for false arrest.  And what I
13 was -- I remember I was told at the time that they
14 literally wrote him a check for $50 to go away and the
15 suit went away.  I don't know what the actual
16 disposition of that was.  That was the only time I was
17 ever the subject of a suit while -- well, actually,
18 ever.
19     Q.   Have you ever been a party to any civil
20 lawsuit?
21     A.   No.  Again, I've never been sued as part
22 of any action by anybody.
23     Q.   What about a plaintiff in any lawsuit?
24 Have you ever been a plaintiff?
25     A.   No, I have never sued anybody.

Page 83

1      Q.   Okay.  Do you have any criminal history?
2      A.   No.  I've never been arrested, charged,
3  or have any criminal history of any kind, ever.  Got a
4  couple of speeding tickets when I was in college.
5      Q.   When you worked for the sheriff's
6  department, were you ever the subject of any
7  discipline?
8      A.   A couple of times.  Once I had to work a
9  couple of days off in lieu of suspension in probably
10 1978 or '79 because I was careless and backed my
11 police car into a tree.  So, yeah, I got dinged for
12 that.  I had very few complaints.  And I don't
13 remember ever getting any kind of substantial
14 discipline for anything.
15     It might have been where my sergeant or
16 lieutenant or captain whatever said, Yeah, that wasn't
17 the best choice, but I don't remember there being any
18 kind of documented discipline.  I was never suspended.
19 I was never restricted to office duty or lost days off
20 other than, again, that one time as a brand-new
21 patrolman when I stupidly backed the police car into a
22 tree.
23     Q.   Okay.  And when you retired there was no
24 pending investigation or discipline on you in
25 Jacksonville?

Page 84

1      A.   Oh, no.  There was no pending
2  investigation or discipline on me from anywhere,
3  Jacksonville or, you know, anywhere else.  No,
4  nothing.
5      Q.   So when you left in '99, did you leave
6  with the intention of forming this new business?
7      A.   I left with the intention of doing
8  something different.  At the time that I retired, I
9  had been offered and had accepted a position working
10 for a government contractor called DynCorp and would
11 have been -- and was accepted, would have gone to
12 Texas for training and then been deployed in Bosnia
13 and Herzegovina with the United Nations as what's
14 called their CivPol, or civilian police, for the
15 purpose of training the local personnel there as
16 police officers.
17     However, just before -- just literally
18 two days from leaving, I received information from a
19 source within the contracting community that explained
20 that there was some irregularities going on within the
21 CivPol community, the military contractor community in
22 Bosnia and Herzegovina and in Serbia at that time.
23     And so after discussion with my wife, who
24 really wasn't that happy with having me going around
25 the world, I decided to withdraw from that employment.

Page 85

1  And there was some time later where there were
2  actually significant problems revealed that supported
3  the fact that the intelligence I got was accurate.  So
4  I didn't plan on going into this whole field of dog
5  stuff.
6      Q.   So what caused you to go into it?
7      A.   My wife got me a dog and I started
8  working with him and learning about training, and that
9  sparked my interest.  And the more I trained and
10 different things we trained for, the more I got
11 involved and started educating myself, started
12 pursuing various certifications over time, did things
13 like worked with drug detector dogs, trained obedience
14 dogs, trained competition dogs for hunt tests and
15 field trials.
16     And as I got more educated in the science
17 and practices of dog training, I became interested --
18 about 2001, when there was a human fatality in
19 California, the victim was a woman by the name of
20 Diane Whipple, and that was the first time I had
21 become aware of a fatal dog attack.  And the old cop
22 in me started wondering what in the world was going
23 on.
24     And that led me down to increasing my
25 education, increasing experience, getting to know some

James Crosby
February 07, 2023

Page 86

1  of the people in the field.  And that started me down
2  this long path that is now where we are today with me
3  finishing my Ph.D. and having been involved in so many
4  of these cases.
5       Q.  So prior to '99, did you have any dog
6  training experience?
7       A.  Very, very basic dog training experience.
8  Again, my wife actually got me the dog I had probably
9  two years before that and I got interested in the
10  training.  I did not see it as a career, but
11  simply enjoyed it and started working and learning
12  about it.
13      Q.  So when was the first time you had any
14  income from this business, the canine business?
15      A.  Probably by 2003 or '4 I had occasionally
16  been hired by people to train their dogs for
17  competition, and that continued on for a while.  And
18  that grew over time, but then I got to the point where
19  I was either going to have to buy a bunch of acreage
20  someplace and have a whole bunch of dogs under my
21  thumb being trained all the time or I was going to
22  have to cut back on that and look for different ways
23  of going, teaching.  And so I kind of shifted paths
24  along there.
25      Q.  When was the first time you offered

Page 87

1  expert testimony in a legal case?
2       A.  Oh, lord.  Probably somewhere around --
3  as far as -- okay.  As far as applicable to dog
4  behavior and dog issues -- because I won't count the
5  police officer stuff before that -- probably around
6  2005 or '6.  The first certification I got was the
7  national certification as a certified professional dog
8  trainer under the Council for Certification of
9  Professional Dog Trainers.  So that was the first
10  professional certification in the field.
11      Q.  And in 2008 it looks like you went back
12  to work for Bay County Animal Control?
13      A.  Yes.  In 2008 I accepted a position as
14  the division -- the animal control division manager,
15  so essentially the chief of the animal control
16  division in Bay County, Florida.
17      Q.  Why did you take that job?
18      A.  My wife wanted me to get another job and
19  get back to work and get out of her way.  And the job
20  came open.  I saw the posting on it.  It looked like
21  something that I would be interested in.  So I applied
22  and they hired me.
23      Q.  And why did you leave that job?
24      A.  I left and resigned from that job -- the
25  last straw, if you will, was my bosses did not support

Page 88

1  me in a decision that was later determined by outside
2  personnel to have been the correct and legal decision.
3  But there had been a period of time towards the end
4  where I was being asked to do things that were
5  unethical and in fact illegal and refused to do so.
6  So I finally had enough.
7       Q.  Were you subject to or investigated for
8  any discipline there?
9       A.  I was complained upon that alleged that I
10  had mishandled a situation where one of my officers
11  had, without my knowledge or permission -- it's going
12  to sound silly, but he took a wild pig that had been
13  surrendered to animal control and without my
14  permission, since nobody wanted the pig -- and as an
15  adult, wild, intact boar with tusks had tried to
16  injure a number of people -- he took it to the farm
17  that he lived on, because he was a farm kid, and he
18  humanely slaughtered it and made it into barbecue.
19          I disciplined him as much as the county
20  rules allowed.  I also put in a new rule that nobody
21  working for animal control could take anything of any
22  kind home and eat it.  And I handled the situation,
23  but a volunteer who was being investigated for illegal
24  hoarding and transport of pet animals without proper
25  permits and so forth complained that somehow I was

Page 89

1  responsible for stealing these people's pig and eating
2  it.
3          The story was actually on the front page
4  of the food section of the Huffington Post, to show
5  you how ridiculous it got.  I was told later that the
6  county manager had gone to the -- there's an
7  organization of city and county legal people.  They
8  reviewed my actions of disciplining the officer and
9  changing the policies and found that I had done
10  everything correctly.
11      Q.  Okay.
12      A.  The officer had messed up, but with the
13  lack of support and the other activities such as being
14  ordered by my immediate boss to falsify DEA paperwork,
15  I had finally had enough.
16      Q.  So you were -- you resigned during an
17  investigation into that; is that fair to say?
18      A.  Yes.
19      Q.  Okay.
20      A.  An investigation that eventually
21  exonerated me.
22      Q.  During your career in law enforcement or
23  in animal control, did you ever shoot a dog?
24      A.  No.
25      Q.  Have you ever utilized a baton on a dog?

James Crosby
February 07, 2023

Page 90

```
 1      A.   Yes.
 2      Q.   When was that?
 3      A.   During my police career, there were
 4 probably a couple of occasions -- I can't tell you
 5 when, it's been so long ago -- where I used the baton
 6 as I was taught to keep the dog at a distance while I
 7 got away from it.
 8           That's what we still teach people to do
 9 with batons.  I never struck a dog with a baton.  I
10 simply used it as a barrier.  And in animal control
11 cases, I've maybe used it to keep space between me and
12 a dog a couple of times, maybe.
13      Q.   So when you were working during this
14 period -- this two-year period with animal control
15 were you on the street?
16      A.   I was the division manager from February
17 of 2008 to September of 2010.  So not -- and it was a
18 very small agency.  So, number one, to support my
19 officers and also because sometimes we had calls that
20 were -- that required multiple people, and also when
21 we had calls that were, for instance, investigating
22 serious animal cruelty where somebody who knew what
23 they were doing was going to have to go to court and
24 testify, I would also go out on the street with the
25 officers.
```

Page 91

```
 1           And, for instance, in cases where we made
 2 seizures in hoarding cases where one lady, for
 3 instance, had 94 Chihuahuas in a single-wide trailer
 4 that was contaminated with feces and urine and
 5 everything else, I would go out to the scene with
 6 them.  When we rescued some people during a flood, I
 7 was out on the scene with them.  So I was in the
 8 office, but I regularly went out in the field with my
 9 officers.
10      Q.   Have you ever used a taser on a dog?
11      A.   No, I have never used a taser because I
12 never went through the taser certification.
13      Q.   So you've never deployed a taser, period?
14      A.   No, I have not personally.
15      Q.   Have you ever used OC or pepper spray on
16 a dog?
17      A.   Yes.
18      Q.   Tell me about those instances.
19      A.   Probably a couple of times when I was a
20 patrolman or was a police officer and once or twice
21 during my work as an animal control officer to deter a
22 dog that was coming at me, and that's probably about
23 it.  I've used it far more often on humans than on
24 dogs.
25      Q.   Okay.  Actually, did you ever deploy your
```

Page 92

```
 1 firearm as an officer?
 2      A.   Yes.
 3      Q.   Did you ever shoot another human?
 4      A.   Yes.  Once I injured a fleeing prisoner
 5 that was an escapee from custody.  The other times --
 6 there were three times I fired in self-defense and
 7 unfortunately did not hit what I was aiming at.  And
 8 one time I used a shotgun to disable a stolen car that
 9 was fleeing and had run over another police officer.
10 And the chase had gotten to the point where it was too
11 dangerous to let them go and too dangerous to continue
12 it.  So I disabled a vehicle by shooting out its front
13 tire.
14      Q.   And that was allowed under policy at the
15 time in Jacksonville?
16      A.   At the time, yes, that was allowed under
17 policy in order to protect the public, provided that
18 you had a safe backdrop, that you had the situation as
19 under control as possible, and that the risk of
20 continuing the pursuit was higher than was acceptable.
21 Again, you couldn't -- you didn't have the ability to
22 just let them go because there was too much of a risk
23 there.  And this was before we had the stop strips,
24 the spikes that we put in the road.
25      Q.   Do you know if that policy is still
```

Page 93

```
 1 allowed in Jacksonville?
 2      A.   I believe that in Jacksonville, like most
 3 places, you no longer are really permitted to shoot at
 4 moving vehicles unless the guy is actually shooting at
 5 you.  I doubt that it's now part of policy.
 6           I do know that over the years changes
 7 have been made.  And, for instance, there were times
 8 when -- I never did it, but police officers were known
 9 to jump out in front of fleeing suspects and then use
10 that as an excuse to shoot into a car.  That was done
11 away with before I retired.  And the restrictions now
12 on use of firearms are very happily a lot tighter.
13      Q.   That's a good example of best practices
14 changing in law enforcement since you retired;
15 correct?
16      A.   Absolutely.  And that's why I keep up
17 with that.
18      Q.   All right.  During your career in law
19 enforcement, did you ever investigate an officer or
20 did any officer in your chain of command shoot a dog?
21      A.   I don't remember any of my officers ever
22 shooting a dog.  I remember as a patrolman that other
23 officers who worked for other sergeants in other areas
24 or whatever occasionally shot dogs, but frankly in the
25 late 1970s there was a lot of shooting of things going
```

James Crosby
February 07, 2023

1  on, including people, that we would not find
2  acceptable today.
3      Q.   What about do you recall any
4  investigation or any officer in your chain of command
5  that used a baton or OC on a dog?
6      A.   I remember officers using batons to keep
7  them away from them.  I do remember -- once we went to
8  OC, because it's a more focused tool, I remember other
9  officers that sprayed dogs and kept the dogs away from
10 them.
11          Before that we had a product called mace
12 that, A, had limited effect on animals, and B, it
13 sprayed everywhere and it was persistent so that, for
14 instance, if you got it on your uniform shirt, it
15 continued to radiate off of that until you washed the
16 shirt.  But that was pre OC.  So that's a long time
17 ago.
18     Q.   Have you ever been attacked by a dog?
19     A.   Yes.
20     Q.   How many times?
21     A.   Well, kind of in my work evaluating
22 aggressive and dangerous dogs, I have been bitten
23 quite a few times.  Fortunately, in the most serious
24 of those, I have Kevlar protective equipment that I
25 wear, pants, gloves, armguards.  It's not like a

1  dog -- like a canine training suit.  I've also used
2  those when working with the canines.
3          But I have been attacked without the
4  equipment a couple of times and have taken some
5  moderate injuries involving -- that involved sutures
6  and other medical procedures.  So, yeah, I've been
7  nailed by dogs quite a few times.
8      Q.   Have you ever had to get medical
9  treatment for a dog bite?
10     A.   Several occasions.  I did with a dog I
11 was training for the government -- or working with in
12 the Bahamas where I took a number of stitches across
13 the palm of my hand.  I was injured during the
14 response to Hurricane Katrina in New Orleans where I
15 had to go to the Army Field Hospital and get treated
16 for a pretty significant bite to my arm.
17          I've had sutures in my hand across the
18 webbing of my thumb where a dog's teeth tore
19 completely through between the fingers.  And I've had
20 other bits and things and pieces.  So I've never been
21 admitted to the hospital from a dog bite, but I have
22 received medical treatment quite a few times.
23     Q.   So what training have you received in
24 veterinary medicine?
25     A.   Okay.  I started -- the first class I

1  took through the University of Florida was on animal
2  crime scenes and right after that forensic behavior
3  analysis.  Since then I have had classes in forensic
4  imaging, in anatomy, in forensic pathology, in further
5  behavior analysis, in skeletal wound analysis, in
6  osteology, in microbiology and biome in animals and
7  humans.
8          I've had training in -- oh, lord.
9  There's quite a long list of courses that I have taken
10 through the college of veterinary medicine, including
11 veterinary forensic medicine, animal crime scenes,
12 animal cruelty, applied forensic behavior analysis,
13 forensic -- veterinary radiology and imaging,
14 pathology and practice, advanced pathology and
15 necropsies.
16          So there's been a lot of coursework
17 through both my master's and my doctoral degree in
18 various parts of veterinary medicine, along with
19 experience observing and working with veterinarians,
20 particularly in forensic cases, and doing things like
21 necropsies and wound analysis, tracing bullet wound
22 trajectories through victim animals.  Yeah.  There's
23 been a lot.
24     Q.   But most of these sound to be kind of on
25 what I'll just say the back end, investigation-type

1  things, not for, like, treatment of ear infections in
2  dogs; right?
3      A.   No.  I'm not licensed as a veterinarian
4  to prescribe medication or perform surgeries.  My
5  focus has been analyzing injuries that have occurred,
6  documenting those, and then also being able to be with
7  a veterinarian during a necropsy and gather evidence
8  and analyze the wounds and come to conclusions about
9  that.  On top of that, then there's also been the
10 coursework in animal behavior and behavior analysis.
11     MR. ABRAMSON:  Okay.  We've been going
12 for a little bit.  Why don't we take another
13 ten-minute break.  If you want longer -- do you want
14 15 minutes to 2:15?
15     MS. SCHIELKE:  It's up to Jim.  Do you
16 want ten or 15?
17     THE DEPONENT:  Ten is fine with me.
18     (Recess taken, 1:59 p.m. to 2:11 p.m.)
19     Q.   (BY MR. ABRAMSON) Mr. Crosby, you
20 understand you're still under oath.  Do you currently
21 teach any law enforcement courses?
22     A.   I teach the law enforcement dog
23 encounters training course most recently -- that was a
24 few months ago, end of last summer, the metro Dade
25 Miami Police Department.  I think it's actually called

James Crosby
February 07, 2023

1  Miami-Dade Police.  So I taught them.  I have taught
2  dog bite investigation and fatal dog bite
3  investigation to both animal control officers and to
4  police officers and have done that on a number of
5  different occasions in a number of different places,
6  so yeah.
7      Q.   So is there a version of the Colorado Dog
8  Protection Act required training under the FDLE?
9      A.   No.
10     Q.   So this class for Miami-Dade, is that a
11  requirement under their training?
12     A.   Their training department, at the
13  direction of their chief of police, contacted me to
14  come train their officers due to a couple of shootings
15  that they had determined, without me, were unjustified
16  and improper.
17     Q.   So this was kind of a one-time thing; is
18  that fair to say?
19     A.   For Miami-Dade I trained their training
20  staff so that they could then go out and train the
21  bulk of their department.  They have 6,000 officers.
22  It would have taken me the rest of my life to train
23  every one of them.
24     Q.   Before that police training course, what
25  was the one prior to that?

1      A.   Let's see if I've got it noted here
2  somewhere.  There have been quite a few of them that
3  I've done places.  Let's see.  So I taught at the 2019
4  National Animal Care and Control Association
5  conference.  I taught dangerous dog evaluation to
6  Chicago Animal Control.  I'm looking for police.
7           I worked with and trained the Animal
8  Warden Corps for the government of the Bahamas.  I
9  taught at Philadelphia Animal Control, instructed in
10  Converse County, Wyoming, to the Converse County
11  Sheriff's Office.  Let's see.  I taught in Nye County,
12  Nevada, at their police academy on two different
13  occasions, trained the Las Vegas Metro Police civil
14  and constable division, taught at Association of
15  Prosecuting Attorneys.  So there's quite a few of
16  them, going back to the Australian Federal Police.
17  Yeah.
18     Q.   Okay.  And in your materials it states
19  you are a certified behavior consultant, canine
20  knowledge assessed.  What does that mean?
21     A.   That means that under the rules of the --
22  there are two national groups that certify trainers
23  and behavior consultants.  One is the International
24  Association of Animal Behavior Consultants.  The other
25  is the Council for the Certification of Professional

1  Dog Trainers.
2           The title you just referred to, the
3  CBCCKA, is under the Council for Certification of
4  Professional Dog Trainers.  What that means is to get
5  that I had to have many hundreds of hours of
6  experience.  I had to meet educational requirements as
7  far as both class and seminars on dog behavior.  I had
8  to have recommendations from veterinarians and from
9  clients.
10           I had to display a bunch of skills and I
11  also had to pass a psychometrically evaluated written
12  examination to get that certification.  And then for
13  that certification, I have to maintain continuing
14  educational credits over time, just like you would
15  with ICLE or whoever regulates attorneys in Colorado.
16     Q.   So the organization that issues that
17  certification, do you have any affiliation with that
18  agency?
19     A.   I am now on their national board of
20  directors.  I was not when I first became certified.
21     Q.   Okay.  And you presented in Denver in
22  2006 at the National Dangerous Dog Summit.  What was
23  that?
24     A.   That was a conference put together by
25  a -- and she's a friend, so I'm not going to say

1  anything bad, but a TV dog trainer by the name of
2  Victoria Stillwell who had a successful show first in
3  the UK and then here in the United States called "It's
4  Me or the Dog."  And she's produced a couple of
5  training books.  She has her own certification group
6  that she started.
7           She put together that conference in
8  Denver and a couple of others where she got a number
9  of people in the field to present over a weekend to an
10  audience about dog bites, dog bite prevention, the
11  behaviors involved in training your dog not to bite
12  people, training your dog how to do basic stuff and so
13  forth.
14           There were people -- I appeared in
15  several of them.  There were a number of people across
16  the dog training industry that were part of those
17  initial conferences.  I recall for a year or two there
18  was one in the UK that I went and spoke at.  I think
19  there was one in Miami, I want to say.
20     Q.   All right.  We mentioned earlier in the
21  deposition this canine aggression blog, and that's no
22  longer active?
23     A.   No.  It's still there.  I still -- I
24  think I still pay for the web address for it, but I
25  haven't contributed to it in quite some time.  And

James Crosby
February 07, 2023

1  that dates back to when I was responding to a lot of
2  requests for training information, and it was kind of
3  the thing when I started that everybody had a blog.
4       Q.   And in that blog have you ever discussed
5  cases that you were an expert on?
6       A.   I discussed situations, but because of
7  confidentiality and so forth, I did not -- to the best
8  of my recollection -- I haven't looked at it in a long
9  time -- I did not specifically name cases or
10  necessarily present details that would have exposed
11  anybody to having their privacy or confidentiality
12  violated.
13       Q.   Have you ever published anything that
14  looked at situations where an officer used deadly
15  force on a dog?
16       A.   I have not published anything that
17  identified any particular case.  And the more I've
18  gone along, the less I've been inclined to share any
19  of that information outside of, for instance, training
20  for law enforcement officers.  And then I try not to
21  identify particular officers especially or even
22  departments.
23            I may have written something about the
24  Commerce City case because at the time it was very
25  much in the media and the video was being shared all

1  over the place.  I don't recall because, like I say, I
2  haven't looked at my blog in a couple of years.
3            Typically it's like with fatal attacks, I
4  have said things, even back when I was saying it, like
5  in the western United States, I'm at an undisclosed
6  location doing such and such.  But I don't want to
7  particularly put anybody's life out there on the
8  Internet.  There's too much of that anyway.
9       Q.   And you authored -- I see something
10  called a Law Enforcement Dog Encounter Training
11  Curriculum and Manual.
12       A.   Yes.
13       Q.   When was this published?
14       A.   It was published by the Department of
15  Justice through their office of community-oriented
16  policing in 2019.  That was the curriculum I put
17  together originally at the behest of the National
18  Sheriff's Association.  It was finished.  We did some
19  preliminary site training.
20            The Department of Justice provided --
21  they provided some kind of funding to the National
22  Sheriff's Association.  I don't know how much they
23  actually provided.  We did a couple of pilot trainings
24  and the Department of Justice then in 2019 published
25  it and approved it as their accepted national standard

1  of police/dog encounter training.
2       Q.   Was it ever used, to your knowledge?
3       A.   I have taught -- I know better than that.
4  I have taught it at a number of different locations
5  around the country.  And then once it received DOJ
6  approval, the dispersal of it was turned over to the
7  National Sheriff's Association.
8            I've trained a couple of times where I
9  was personally asked to go do that since.  I don't
10  know how widely it has been dispersed, what states
11  have used it, what departments have used it.  It was
12  for a long time available on the National Sheriff's
13  Association website for free for any department who
14  wanted either the course itself, our points and videos
15  so forth, and/or the manual for teaching it.  I don't
16  know how far that's been dispersed.  It's the NSA's
17  product now.
18       Q.   Do you know if it's currently in use?
19       A.   I know it's being used in places.  I
20  don't know how often or where.  Again, it's NSA's
21  product and they don't keep in touch with me as far as
22  what's going on.  The latest that I know it was used
23  was when I taught it in Miami-Dade.
24       Q.   Do you have a copy of it?
25       A.   Yeah.  In fact, if you go to the National

1  Sheriff's Association website and search "National
2  Sheriff's Association LEDET," there's links to it
3  right there.  Anybody can download it.
4       Q.   Do you believe that that's user name and
5  password?  Do you have to be a member?
6       A.   No.  The last time I looked, no.  You
7  could just search "National Sheriff's Association
8  LEDET" and it would come up and you could download the
9  manual and you could download the presentation.  Since
10  it's the National Sheriff's Association product and
11  their website, if you have trouble with it, if you'll
12  have Ms. Schielke get in touch with me, I will be
13  happy to send it to her so she can share it with you.
14       Q.   Great.  Thank you.  All right.  So let's
15  go to your report.  Go to Exhibit 21 and go to page 6
16  of the PDF.
17       A.   Okay.  I'm there.  It starts at the top
18  with "Animal Control associations" and then "Materials
19  Examined."
20       Q.   Correct.  You state that plaintiffs were
21  present in a vacant lot in the city of Loveland.
22       A.   In a vacant --
23       Q.   In the summary of events.
24       A.   Right.  That's how the property was
25  presented to me, as being a parking lot at 995 North

James Crosby
February 07, 2023

1  Wilson Avenue, Loveland, Colorado.
2      Q.   Who presented it to you as that?
3      A.   That's the information from counsel.  And
4  I believe it's also what is reflected, yes, in the
5  police report from Officer Matt Grashorn submitted as
6  part of his reporting of this, that it was at 995
7  North Wilson Avenue.
8      Q.   Okay.  Are you aware that that lot
9  belongs to a private owner?
10     A.   I would assume it belongs to somebody
11  somewhere.
12     Q.   Okay.  And have you seen any documents
13  that plaintiffs were authorized to be on that property
14  for personal use or business use?
15         MS. SCHIELKE:  Object to form.
16     A.   I have not seen any documents that either
17  state or deny that they had any business being there.
18     Q.   (BY MR. ABRAMSON) Okay.  Are you aware of
19  any law that would make plaintiffs' presence on that
20  property that belonged to another lawful without
21  permission?
22         MS. SCHIELKE:  Object to form.
23     A.   The law tends to state what is
24  prohibited, not what is allowed.  I can say that
25  having looked at Colorado statute and being familiar

1  intimately with Florida statute, an open area that is
2  not fenced or posted according to certain requirements
3  is not a property that, for instance, as a police
4  officer I could arrest somebody for simply parking
5  and/or walking across or working on their truck or
6  anything like that.
7      Q.   (BY MR. ABRAMSON) Okay.  And in your
8  report you say plaintiffs were acting in a lawful
9  manner.  What do you mean by that?
10     A.   Looking at the body-worn camera video
11  from Officer Grashorn, it appears that the plaintiffs
12  were in an unenclosed area on a parking lot doing
13  something with their truck with their dogs with them.
14  It was daytime.  They were easily visible, at least
15  from the body camera.  They did not appear to be
16  bothering the building or anything else.  So, yeah, I
17  would say that they appeared to be acting in a
18  peaceful and lawful manner.
19     Q.   Are you familiar with either the city of
20  Loveland or the state of Colorado's laws regarding
21  having dogs leashed?
22     A.   I've reviewed --
23         MS. SCHIELKE:  Object to form.
24     A.   -- the Colorado statute and Loveland's
25  ordinance, and yes, they do require dogs to be leashed

1  when they're off their own property.
2      Q.   (BY MR. ABRAMSON) These dogs were not
3  leashed; correct?
4      A.   When they came out of the truck, no, they
5  were not leashed.
6      Q.   We talked earlier that you don't recall
7  referring to what the property owner told police, but
8  did you read anywhere what the property owner told
9  police?
10     A.   I don't specifically recall that at this
11  time as to what was exactly said by the owner to the
12  police.
13     Q.   I didn't see that you referred to
14  Loveland's ordinance regarding animals at large.  Is
15  that what you're referring to, which is Loveland's
16  Ordinance 6.2.010?  Is that something you reviewed?
17         MS. SCHIELKE:  Object to form.
18     A.   I looked at the Loveland animal
19  ordinances.  I can see they have a leash law, and the
20  leash law is a civil infraction that, according to
21  what I read, does not include the mandatory
22  destruction of an animal that's not on a leash.
23     Q.   (BY MR. ABRAMSON) Okay.  But that wasn't
24  my question.  You believe you did review the ordinance
25  regarding dog at large?

1      A.   Yes.
2      Q.   Okay.  So in your summary of events, you
3  say that Officer Grashorn went to investigate, and you
4  have that in quotes.  Why did you put that in quotes?
5      A.   I don't know where you're seeing quotes.
6  I'm looking at the page.
7      Q.   So under "Summary of Events."
8      A.   Right.  It says, "On 29 June, 2019,
9  Officer Grashorn was sent to investigate a call
10  regarding Ms. Love and Mr. Hamm's presence in a vacant
11  parking lot located at" blah, blah, blah.  There's no
12  quotes in there.  I'm sorry.  The next paragraph down,
13  Loveland Police dispatch still sent Officer Grashorn
14  to "investigate" their presence in the empty parking
15  lot during daytime hours.
16         So "investigate" is in quotes there
17  because to me in my law enforcement experience and so
18  forth, somebody simply stopped in a public -- or an
19  open and unenclosed parking lot during the daytime
20  really doesn't require a whole lot of investigation.
21         Officers that worked for me, and myself
22  included, the most one of us would have done would be
23  drive by, see that they were over there, and maybe, if
24  the dogs were running loose at that moment, say, Hey,
25  make sure you keep your dogs in your truck or put them

James Crosby
February 07, 2023

Page 110

1  on a leash.  So "investigate" is referring to the
2  dispatch sending Officer Grashorn on what was
3  basically a waste of time.
4      Q.   So in your opinion, Officer Grashorn
5  either shouldn't have been dispatched or should have
6  disregarded the dispatch?
7      MS. SCHIELKE:  Object to form.
8      A.   He either shouldn't have been dispatched
9  because there was no allegation of a crime or he
10  should have taken it as an advisory kind of issue and
11  driven by so the owner saw that there was a police car
12  that had looked at the property and in a
13  nonconfrontational and nonviolent way kind of
14  eyeballed who was there and what they were doing.
15      If that had developed into seeing them,
16  for instance, crawling through the window into the
17  closed business or doing something openly illegal
18  other than just simply having their dogs hanging in
19  their truck without a leash, then obviously there
20  would have been reason to go further.
21      Q.   (BY MR. ABRAMSON) Again, you don't
22  know what was conveyed and didn't review what was
23  conveyed from the property owner to the police?
24      MS. SCHIELKE:  Object to form.
25      A.   I don't recall what the audio recordings

Page 111

1  said at this time.  I didn't go back and review them.
2      Q.   (BY MR. ABRAMSON) In any of these cases
3  that you investigated a human fatality, did those
4  involve what other people would call a pit bull or pit
5  bull mix?
6      A.   Yes.  They have involved what other
7  people call pit bulls and Rottweilers and Beagles and
8  Golden Retrievers and everything you can imagine.
9      Q.   Did Jacksonville have a policy regarding
10  use of force against an animal?
11      A.   Back when I was on the department,
12  Jacksonville had no policies on dealing with animals
13  other than if you were going to shoot an animal, you
14  had to get your sergeant's approval.  And that
15  approval, I heard it on the radio many, many times.
16      I never used it, but back, again, in the
17  late 1970s, officers with the Jacksonville Sheriff's
18  Office shot various animals for various reasons,
19  including dogs, cats, alligators, deer, horses.  All
20  they had to do was get their sergeant's permission and
21  there was no investigation conducted.
22      Q.   Have you read any medical journals
23  discussing dog bites?
24      A.   Yes, quite a few.
25      Q.   Okay.  Did you read a medical journal

Page 112

1  that -- the Oral and Maxillofacial Surgery Journal
2  about dog bite injuries to the cranial region in March
3  of 2020?  Does that ring a bell?
4      A.   Which author?  Who's the primary author?
5      Q.   Khan is the author.  Kiran Khan.
6      A.   I don't recall that particular article,
7  but then a lot of the medical articles in things like
8  the Oral and Maxillofacial Journal and so forth regard
9  treatment strategies and case reports on, for
10  instance, surgical reconstruction.  And as I am not a
11  physician and am not treating people for dog bites, I
12  don't go as deeply into those or read quite as many of
13  those.
14      Q.   Dr. Khan opined that the probability of a
15  dog bite resulting in a complex wound was 4.4 times
16  higher for pit bulls compared with other breeds.
17      MS. SCHIELKE:  Object to form.
18      A.   That would be junk science when it comes
19  down to it because, number one, we don't know how many
20  pit bulls there are or what constitutes pit bulls.  We
21  don't know exactly how many dogs there are in this
22  country.  We can guess from some of the purebred
23  registries.  And so we don't know how many dogs there
24  are.  We don't know how many there are of any
25  particular type.

Page 113

1      When you get to working on mixed breeds,
2  there is no standard of determining whether 1 percent
3  pit bull -- even if it really is pit bull, 1 percent,
4  51 percent, or 91 percent is required to be a pit
5  bull.  So people, even otherwise educated people, tend
6  to take some of the statistics that are based on
7  nothing more than myth or bad information and try to
8  project from that, when it cannot be scientifically
9  and statistically so stated.
10      Q.   (BY MR. ABRAMSON) Okay.  There was also
11  an article of Dog Bite Injuries to the Face, a
12  Systematic Review of Metanalysis by Dr. Essig, in the
13  Pediatric, I guess, Otorhinolaryngology --
14      A.   Otolaryngology, whatever.
15      Q.   Yeah.  Do you know about that one?
16      A.   Again, I don't recall reading that
17  particular one, as it would pertain to treatment
18  strategies and, you know, different surgical
19  reconstruction methods, which again, I don't know.
20  I'm not a physician.
21      Q.   And then there was a study by Dr. Golinko
22  of Clinical Pediatrics published in April 2017 who did
23  a data study of 1,616 consecutive dog bite injuries at
24  a trauma center who indicated the data was consistent
25  with others that operative intervention was three

James Crosby
February 07, 2023

1 times as likely to be associated with a pit bull
2 injury than any other breed.  Is that something you
3 read?
4          MS. SCHIELKE:  Object to form.
5          A.    No, I did not read that.  And that's not
6 a statistic that we can come up with, whether it's pit
7 bulls or Labrador Retrievers, because there is no
8 baseline to compare to and we do not have a definition
9 of what those dogs are.
10         A pit bull is usually whatever people
11 think to them looks like a pit bull.  In the United
12 Kingdom, for instance, breed is actually defined as
13 far as pit bulls by a dog legislation officer with a
14 cloth dressmaker's measuring tape that measures
15 different things.  And if your dog, regardless of his
16 genetics, meets their measurements, it's a pit bull no
17 matter what it is.
18         In this country we don't -- I wish we did
19 have an actual definition.  And unfortunately, most of
20 these medical cases, the physicians, although they're
21 highly qualified physicians, are not qualified as far
22 as dog identification, nor in most cases do they
23 actually see the dog.  They're usually taking second
24 or thirdhand information as to what the dog supposedly
25 was based on what somebody saw.

1          Q.    (BY MR. ABRAMSON) Okay.  And then there
2 was a publication, the Annals of Surgery 2011.
3          A.    Annals.  It's got two N's.
4          Q.    By Dr. Benny, did you read that?
5          A.    Yes.  That one I did read, and quite
6 sometime ago.  And I haven't reviewed it in a long
7 time, but there were a number of factual difficulties
8 with that study that, in my opinion -- among other
9 things, it was a very small sample size at one
10 hospital in Texas.  I believe he was in Dallas and
11 there were a number of factual difficulties that made
12 his conclusions unsupportable.
13         Q.    Okay.  And in that article Dr. Benny
14 opined that attacks by pit bulls are associated with
15 higher morbidity rates, higher hospital charges, and a
16 higher risk of death than any other breed of dogs.
17         A.    Yeah.  That's not true.
18         MS. SCHIELKE:  Object to form.
19         A.    Yeah.  That's not true because, again, we
20 don't know how many of what kind of dogs, even in my
21 limited population of dogs that actually kill.  It's
22 very difficult, especially in older cases that are
23 more than, like, last year or the year before to
24 identify because there's never been DNA analysis of
25 the breed mixes and the breeds involved and whether

1 those have any significant correlation with behavior.
2 Appearance -- the studies that do exist show that
3 appearance and behavior are not necessarily correlated
4 and they do not -- they are definitely not cause and
5 effect.
6          Q.    (BY MR. ABRAMSON) So of all these
7 articles from medical journals, it's your opinion that
8 these are all junk science; correct?
9          MS. SCHIELKE:  Object to form.
10         A.    No.  Their statistics are often based on
11 junk information and, as the computer people say,
12 "garbage in, garbage out."  I am sure that their
13 medical knowledge and techniques and medical analysis
14 of wounds and healing and proper medications and so
15 forth is highly skillful.  When you base your guesses,
16 like the expert Major Ijames did, on suspect and
17 faulty sources, there's nowhere you can go but having
18 faulty conclusions.
19         Q.    (BY MR. ABRAMSON) Do you mention in your
20 report that these dogs were not on a leash anywhere?
21         A.    Let's see.  I said that they were in
22 possession of the dogs.  I mention in the information
23 considered that the one dog was visible laying on his
24 side in the parking area and rises to its feet.  I do
25 not say that he's on a leash, so obviously he's not.

1          He begins to move forward.  Then the
2 other dog comes out.  And they're obviously -- from
3 that they are running without being restrained.  So I
4 do not state it specifically, but I think it's obvious
5 reading it that these dogs were not on a leash.  I
6 have had no argument with or disagreement with the
7 state that they were not on a leash.
8          Q.    What was the size of Bubba?
9          MS. SCHIELKE:  Object to form.
10         Q.    (BY MR. ABRAMSON) That you could tell
11 from looking at this?
12         A.    At a distance Bubba would probably be
13 qualified as a relatively large dog.  From having
14 looked at the video, he's a pretty substantial dog.
15 Compared to the people back by the truck, he seems to
16 be at the shoulders, probably a little bit taller than
17 knee high to the gentleman in the video.  And Herkimer
18 appears to be somewhat smaller and is definitely
19 slighter of build and lighter of body.
20         Q.    Just an estimate from eyeballing and your
21 experience in being in animal control, what would you
22 put the weight of Herkimer at?
23         MS. SCHIELKE:  Object to form.
24         A.    A guess of Herkimer's weight would be
25 probably in the 50ish pound area.  I do have the

James Crosby
February 07, 2023

1  veterinary records that indicate what he actually
2  weighed, which according to this, the plaintiffs'
3  estimate was 70 to 75 pounds.  So I'd say that the 50-
4  to 70-pound range would have been my guesstimate on
5  the spot.  He's not a big, thick dog.  He's smaller
6  than my curly-coated retriever at 82 pounds.  He's
7  taller than one of my dogs who's about 50 pounds, so
8  somewhere in there.
9          Q.   (BY MR. ABRAMSON) Do you know what was on
10  Officer Grashorn's duty belt?
11         A.   I have seen that there was a report that
12  he had his firearm, that he had a taser, and he had a
13  baton, but for some reason he chose not to carry OC
14  spray.
15         Q.   Okay.  Would you agree that based upon
16  review of the body cam footage, which is all we
17  have -- just for the record, you were not there;
18  correct?
19         A.   Correct.  We have the body cam footage.
20         Q.   All right.  And there's no audio on the
21  body cam footage, is there?
22         A.   Not at that point there isn't, no.
23         Q.   Is it fair to say that at the time
24  Officer Grashorn drew his firearm, Bubba was running
25  at Officer Grashorn?

1          A.   It would be accurate to say -- and I'm
2  looking at the video right now -- Bubba does exit the
3  truck or is out of the truck laying in the parking
4  lot, runs towards Officer Grashorn, and then as soon
5  as Herkimer joins him, turns around and diverts back
6  to the truck directly.
7          Q.   Okay.  And Herkimer continued to run
8  towards Officer Grashorn; is that correct?
9          A.   Yes.  Yes.  When Herkimer breaks off from
10  basically intercepting Bubba, Herkimer runs towards
11  Officer Grashorn's position with a bouncy step, with
12  his tail up and wagging, his mouth open, and his
13  tongue flapping and his ears flapping in the breeze.
14         Q.   So let's kind of talk about ears up.
15         A.   His ears are not up.  His ears are
16  flopping because he has floppy ears, not erect ears.
17  The ears up would indicate a dog that has raised their
18  ears using muscular tension and is thereby focused on
19  a target.  He's got floppy ears.
20         Q.   So they're just going --
21         A.   They're flopping up and flopping down in
22  a nice, relaxed manner.
23         Q.   You said the tail was wagging?
24         A.   Yes.
25         Q.   And so a wagging tail can mean a friendly

1  dog; correct?
2          A.   Yes, it can.
3          Q.   And it can also mean aggression; correct?
4          A.   It does not mean aggression.  It can
5  indicate a dog's level of emotional or physical
6  arousal.  Aggression is tip -- the behaviors in the
7  aggressive cluster typically include an erect, stiff
8  tail that is locked in place so that the dog is
9  conveying to another dog that they are not to be
10  messed with and they are not to be challenged at that
11  point.
12         The wide, loose, back and forth wagging
13  that Herkimer shows in the video all the way to the
14  point where he is shot, and even when he was leaving
15  from the truck and meeting with Bubba, is very loose.
16  It's back and forth and rotates around.  It's a very
17  relaxed wagging behavior consistent with a friendly or
18  playful dog.
19         Q.   But it can be arousal as well?
20         A.   Not like -- not in this manner, no.  A
21  tense and aroused tail would be mostly erect and might
22  be moving a little bit or stuck straight up or
23  straight back.  It's interesting that you mention that
24  because this very pale-type wagging or this very type
25  of tail wagging is used within my law enforcement dog

1  encounter training in an oncoming large pit bullish
2  type, if you want, dog as a test indicating that
3  behavior, exactly like Herkimer's, is nonthreatening
4  and that is a non-shoot situation.
5          Q.   Would it be fair to say that Herkimer, if
6  there was a voice command given, did not respond to
7  voice command?
8          MS. SCHIELKE:  Object to form.
9          A.   I would agree that if Herkimer was called
10  that he did not respond to that voice command.
11         Q.   (BY MR. ABRAMSON) So we talked a little
12  bit about the use-of-force continuum, which was the
13  terminology used when you were in the department.
14  Does an officer need to be injured before he can use
15  deadly force?
16         A.   That depends on the policies of the
17  department.  I am aware of some departments who have
18  implemented that as a level of requirement, which I
19  disagree with.  In general, in my experience and in my
20  training as an officer, you do not have to be
21  physically injured in order to be able to use deadly
22  force based on other factors.
23         Q.   You mentioned the LEDET 2019 approved by
24  the Department of Justice.  Is that what we were
25  talking about before?

James Crosby
February 07, 2023

Page 122

1    A.   Yes.

2    Q.   Okay.  I just want to be sure.  Did you

3  have any information that Loveland utilized the LEDET?

4    A.   No.  To the best of my knowledge,

5  Loveland used a training by PoliceOne.  And if I'm not

6  entirely mistaken, PoliceOne training included the

7  evaluation of signals such as loose tail wagging as

8  being nonthreatening and nonaggressive.  And, for

9  instance, they also say that breed should not be part

10  of an officer's decision for the discharge of deadly

11  force.

12    Q.   Did you go through the PoliceOne

13  training?

14    A.   Yes.  I went through their presentation.

15  Yes, I did.  Not in person, but online going through

16  their training, along with the training provided by

17  California POST, which I actually helped do, and the

18  training done by the state of Nevada, which they had

19  discontinued after I reviewed it, and the training

20  done by Chicago Humane for law enforcement officers

21  back in 2011.

22    Q.   Okay.  Do you have any information that

23  Loveland utilized any of that training that you just

24  listed or Officer Grashorn took any of that training

25  that you just listed?

Page 123

1    A.   I believe that I remember in the

2  transcript of Officer Grashorn's deposition that he

3  said he had completed the training required by the

4  State of Colorado under the Colorado Dog Protection

5  Act or whatever it is, and that PoliceOne training is

6  the training that at that time was the training

7  provided under that Colorado dog protection or dog

8  training requirement.

9    Q.   Right, but you have no information that

10  he took any of this training from Nevada or Chicago or

11  California?

12    A.   I don't know that he took any of that,

13  no.  I know that he says he took Colorado training.

14    Q.   Does the Dog Protection Act require that

15  officers attempt to use less lethal force prior to

16  using lethal force?

17    MS. SCHIELKE:  Object to form.

18    A.   I don't believe it's required.  I believe

19  it is strongly encouraged, just like you can't require

20  a person -- an officer to never shoot anybody.  You

21  can strongly encourage, but there are times -- and I

22  even teach it in my class -- there are times that use

23  of deadly force is justified.

24    Q.   (BY MR. ABRAMSON) And under the Colorado

25  Dog Protection Act, it emphasizes the use of

Page 124

1  alternatives to lethal force when circumstances allow?

2    MS. SCHIELKE:  Object to form.

3    A.   Correct.

4    Q.   (BY MR. ABRAMSON) Did you run a stopwatch

5  as to how much time passed between when Herkimer began

6  to run at Officer Grashorn and when he fired his

7  weapon?

8    A.   I did not run a stopwatch on it because I

9  cannot absolutely, positively say that the timing I am

10  seeing as far as portions of a second on the camera is

11  identical to the real time running of that video.

12  That's a technical issue that I can't address.  So I

13  would only be guessing.

14    However, I can say that by analyzing and

15  looking at the video, there was enough time between

16  Herkimer's first turning towards Officer Grashorn and

17  the time that Officer Grashorn shot that there was

18  substantial decision-making ability there.

19    Looking at the video right now, Herkimer

20  turns towards Grashorn at the time mark of 13.29.  And

21  by later on in that same time -- and I don't know

22  exactly how far it is apart -- he's already fired his

23  first shot and puts Herkimer on the ground.

24    Q.   So when did you do this PoliceOne dog

25  training?

Page 125

1    A.   It was provided as part of the discovery

2  package, if I recall, and I went through -- so it's

3  been a while, but I went through their presentation,

4  you know, looked at their PowerPoints and the

5  information they're putting out.

6    Q.   Okay.  So you went through the

7  PowerPoint, but you didn't do the three-hour class?

8    A.   No, I did not attend the class.  So I

9  don't know what was actually said during any in-person

10  presentations.

11    Q.   Okay.  But you have a much greater

12  knowledge of dog behavior than what can be taught in a

13  three-hour class; would you agree with that?

14    MS. SCHIELKE:  Object to form.

15    A.   I would agree, because we actually say in

16  the law enforcement dog encounter training class this

17  training is not intended to make you into a dog

18  behavior expert, this training is to help you stay

19  safe.

20    Q.   (BY MR. ABRAMSON) And you read

21  Officer Grashorn's testimony and his transcript;

22  correct?

23    A.   Yes.

24    Q.   How many dogs did Officer Grashorn shoot

25  in his law enforcement career?

James Crosby
February 07, 2023

Page 126

1    MS. SCHIELKE:  Object to form.
2    A.   I would have to actually look it up, but
3  I believe this may have been the first time that he
4  shot a dog in his capacity as a police officer.
5    Q.   (BY MR. ABRAMSON) How many states, if you
6  know, mandate training for dog aggression and dog
7  behavior?
8    MS. SCHIELKE:  Object to form.
9    A.   There are -- and I have not looked in the
10 last year, but there were at least six states that
11 require dog encounter training for police officers.
12   Q.   (BY MR. ABRAMSON) Back to --
13   A.   I know there's a couple of states wherein
14 such legislation was in progress, such as California
15 and I believe one or two states in the northeast.  I
16 don't know at this time what the outcome of that
17 legislative work was.
18   Q.   Are you aware whether Officer Grashorn
19 interacted previously with Herkimer or Mr. Hamm and
20 Ms. Love?
21   A.   To the best of my knowledge, this was the
22 first contact with any of them.
23   Q.   You say that Officer Grashorn approached
24 without verbal warning or notice.  What do you mean by
25 that?

Page 127

1    A.   That there's no indication that -- and we
2  don't know because there's no audio, but there's no
3  indication that, for instance, he called to them and
4  said, Hey, can I talk to you-all, can you-all come
5  over here and talk to me or anything along that line,
6  behavior that I would have found perfectly normal.
7         He also stopped a distance away instead
8  of pulling up closer to -- and frankly instead of
9  pulling up with his car angled to one side so that if
10 there was something going on that was untoward, he
11 would have had cover and concealment should they have
12 turned out to have been bad guys.
13   Q.   Okay.  So you just said he didn't know
14 whether they were bad guys and he should have had
15 cover and concealment; correct?
16   MS. SCHIELKE:  Object to form.
17   A.   That's not what I said.  What I said was
18 he didn't call out to them, but I also observed
19 separately that he also did not pull up any closer and
20 he did not position himself, if he was worried about
21 them being a threat, so that he had cover and
22 concealment.  So he kind of missed the ball on three
23 different things all at the same time.
24   Q.   (BY MR. ABRAMSON) Okay.  But you opine
25 that he should have had no concerns about officer

Page 128

1  safety with interacting with these people?
2    MS. SCHIELKE:  Object to form.
3    A.   There's no such thing as no concern with
4  people even when you know them.  You always have to be
5  concerned.  That does not mean that you have to
6  overreact or that you have to expect immediate gunfire
7  from anybody and everybody.  You have to be careful
8  and aware, but you also have to do your job in a
9  manner that is not overly combative and allows you to
10 communicate with people.
11        And I know that just went out.  I'm
12 plugging it right this second.  I talked to the
13 manufacturer.  Like I said, apparently after it's been
14 on for a period of time the circuit heats up and it
15 goes into a reset.  And I've complained to them twice
16 about it now and they haven't done a whole lot.  Let's
17 see if we can get you back on.  There I am.
18   Q.   (BY MR. ABRAMSON) Okay.  So you already
19 made a point that this was during daytime hours and a
20 well-lit area; correct?
21   A.   Yes.
22   Q.   And Officer Grashorn arrived in a marked
23 police vehicle; correct?
24   A.   Yes.
25   Q.   And he was wearing a police uniform?

Page 129

1    A.   I can only presume so because -- well, in
2  the other video it does show Grashorn walking around.
3  So, sure, he was wearing a police uniform.
4    Q.   What other notice do you think should
5  have been given to tell these people that he was a
6  police officer other than being in a marked police car
7  in a police uniform?
8    MS. SCHIELKE:  Object to form.
9    A.   I would have stepped out and said, Hi,
10 guys, can I come talk to you a minute or can you come
11 talk to me and try to start on an even, safe, but
12 amicable footing.  You know, people talk to you a
13 whole lot more and a whole lot better if you approach
14 them in a normal and polite manner rather than, you
15 know, coming off as something different.  If they had
16 run, then that would have changed his situation, but
17 they didn't.  They came out and talked to him.
18   Q.   (BY MR. ABRAMSON) You say in your report
19 that Herkimer was a friendly dog.  What information do
20 you base that on?
21   A.   I don't believe I actually -- if you can
22 point to me where I said he was friendly.  I said he
23 was behaving in a friendly manner.  That's two
24 different things.  I don't know and can't tell what
25 his mood was.

James Crosby
February 07, 2023

Page 130

1    I can say -- I said in opinion 3, "As
2  Grashorn approached, without verbal warning or
3  notice" -- which we've talked about -- "Love and Hamm
4  opine that Herkimer's behavior was that of an
5  affiliative nature, moving with a bouncy and excited
6  manner."
7    I agree that he was moving in what
8  appeared to be an affiliative manner, wanting human
9  contact, and his gait was bouncy and excited.  It was
10  relaxed.  His tail was wagging.  His ears were
11  flapping, as we discussed before.
12    **Q.   Because you don't -- you never met
13  Herkimer before this, so you don't know whether he was
14  a friendly dog or not?**
15    A.   I don't know what his normal demeanor
16  was.  Friendly really doesn't define anything.
17  Instead, I stick to factors like whether they were
18  affiliative, did they want to be apparently with a
19  human, were they relaxed, were they behaving in a
20  nonthreatening manner.  "Friendly" doesn't have a good
21  definition, any more than "mean" or "upset."
22    **Q.   Right.  So you don't know whether
23  Herkimer had previously bitten anyone or not; correct?**
24    A.   I don't know anything about Herkimer's
25  previous history.

Page 131

1    **Q.   Okay.  Are you aware of cities or
2  counties that have voice command certification?**
3    A.   Voice command certification?
4    **Q.   Yes.**
5    A.   I'm not aware of any.  I'm aware that,
6  for instance, our municipal ordinances near
7  Jacksonville simply state that a dog should -- if a
8  dog is not on a leash, it must respond to voice
9  commands.  There's no certification that I've ever
10  heard of other than maybe an AKC obedience
11  competition.
12    **Q.   Well, there is in Boulder County.  So
13  that's just Boulder County.**
14    A.   Okay.  That's interesting.  I'll have to
15  look that up.  Thank you.
16    **Q.   Okay.  To have your dog off leash in open
17  space, they have to have a certification.**
18    A.   Cool.
19    **Q.   And Herkimer wasn't on an e-collar, to
20  your knowledge?**
21    A.   I do not see any evidence of any kind of
22  a remote collar.  He just simply seems to be wearing a
23  dog collar; but even as you go through the video, even
24  once he's down, other than seeing that it's a
25  blue-colored collar that appears to have a partial

Page 132

1  chain section to it, I can't tell if there's a
2  stimulator unit on it or not.
3    **Q.   Okay.  Does it appear to you in the video
4  that Herkimer appears to be getting up after the first
5  shot was fired?**
6    A.   It appears that the first shot -- again,
7  I'm watching it again as I'm talking you through this.
8  Herkimer comes out of the truck, intercepts Bubba,
9  turns and the moment -- and slowing it down frame by
10  frame, the first shot you can actually see in the
11  frame impact the lateral left side of his head just
12  between the eye and the base of the ear.  There's
13  actually a white spot that you can see the impact of
14  the bullet.
15    He goes down.  He goes down and rolls
16  over with his mouth open and continues to roll.  When
17  the second shot is fired, his feet have not completely
18  come -- in fact, his right forepaw, which is the one
19  closest to the ground, hasn't even come in contact
20  fully with the ground.
21    When the second shot is fired, you see
22  the shell casing that has been ejected by the pistol
23  that is already on its way -- very close to but is
24  ejected from the firearm.  And you can see that the
25  gun at that point is still what's called in battery.

Page 133

1  In other words, the slide is back over the top of the
2  web of the officer's hand.
3    So he's not trying to get up.  He doesn't
4  even get his feet under him.  And as you go another
5  second or two after the second shot, you can see that
6  his left eye is already displaced from his head.  His
7  weight has carried him slightly up again and then he
8  falls flat to the ground.  So he never gets his feet
9  under him to try to get up before that second shot.
10  He's down.
11    **Q.   Did you use a stopwatch to determine the
12  time between the two shots?**
13    A.   No, I have not used a stopwatch to time
14  it, but there's enough time between the shots that
15  Herkimer is hit, turns -- starts to turn his head.
16  His eye on the left side is already going white from
17  the injury.  Rolls to his side, hits the ground,
18  continues to roll over, and while he is down flat on
19  the ground, the second shot is fired.  So to me that's
20  not a quick double tap.  I was taught boom, boom;
21  boom, boom.  Not boom, boom.
22    **Q.   Okay.  Your opinion says there was a
23  significant delay between the shooting and allowing
24  plaintiffs to transport Herkimer to the vet.  Did you
25  calculate that delay?**

James Crosby
February 07, 2023

Page 134

1    A.   I am not sure.
2    Q.   **Well, I'm not asking you to do it now.**
3    A.   No.  I don't recall right off.  I believe
4  it was a matter of, you know, 30 minutes or more, if I
5  recall correctly.  I'd have to look up the actual
6  reference to that, but it was far longer than just a
7  moment or two.
8    Q.   **At the time Herkimer was shot,**
9  **Officer Grashorn appears not to have interacted with**
10 **either of the plaintiffs; correct?**
11   A.   He doesn't seem to have had a long
12 discussion with them, no.
13   Q.   **Okay.  And do you know if he obtained**
14 **identification from them at the time Herkimer was**
15 **shot?**
16   A.   I don't know if he questioned them for
17 their identification at that time or not.  He did
18 not -- the woman came to Herkimer's position.  He did
19 not make physical contact with the gentleman until a
20 bit later when the gentleman walks over to him and
21 appears to provide -- it looks like he's pulling out
22 his ID.
23   Q.   **Okay.  It was a simple question.  Are you**
24 **familiar with Loveland's policies after the discharge**
25 **of a weapon?**

Page 135

1    A.   No.  I'm not sure what their
2  nuts-and-bolts policies are as to who they call, what
3  they call, and how quickly whoever responds responds.
4    Q.   **So when you were at Jacksonville and**
5  **there was a shooting, normally that would require a**
6  **sergeant or someone in command staff to respond;**
7  **correct?**
8    A.   Actually, it required quite a number of
9  people to respond if it was a human.
10   Q.   **Are you aware whether an injured dog can**
11 **be more dangerous due to being in pain?**
12   A.   More dangerous?  It's not more dangerous.
13 An animal -- any animal, including a human, can
14 respond to painful stimuli by trying to either defend
15 itself against a perceived threat or by simply
16 reacting to the pain.  So, yes, an animal can react to
17 pain by trying to bite or claw or whatever is
18 appropriate for that animal.
19   Q.   **Okay.  Do you know if there were any**
20 **steps taken to render aid to Herkimer in the parking**
21 **lot?**
22   A.   There don't -- other than the approach of
23 the female present, there don't appear to be any,
24 especially considering that when the audio does come
25 up from the body cam video, Grashorn tells the woman,

Page 136

1  Ma'am, you're not going to be able to help him.  I
2  think that was really pretty rude.
3    Q.   **Do you know if the veterinary personnel**
4  **that looked after Herkimer in the following days**
5  **opined on whether he could be saved?**
6    A.   According to the veterinary report -- and
7  let me make sure I've got the right page of it -- they
8  do so state that he was -- and I want to find the
9  right statement so I'm not misrepresenting anything.
10 This says, Herkimer's prognosis was guarded to poor
11 due to financial constraints.  Herkimer's family was
12 unable to authorize additional diagnostics or
13 treatment.
14       So they could not authorize further
15 diagnostics to give the veterinarians a better idea of
16 whether Herkimer could or could not have survived the
17 wounds at that point.
18   Q.   **Okay.  So we don't know whether he could**
19 **have been saved or not?**
20       MS. SCHIELKE:  Object to form.
21   A.   No.
22   Q.   **(BY MR. ABRAMSON) Okay.  Eventually a**
23 **decision was made to euthanize him?**
24   A.   That was after his surrender to Larimer
25 Animal Control.  And it doesn't tell me who -- I don't

Page 137

1  see a reference to who actually made the euthanasia
2  decision.  Apparently the dog Herkimer was surrendered
3  to, like I said, Larimer Animal Control.
4    Q.   **Your opinion states that Officer Grashorn**
5  **violated policy when he shot Herkimer; correct?**
6    A.   Which line are you referring to?  I want
7  to make sure I'm looking at exactly the right one
8  here.  Yes.  I did say in opinion 1 that Grashorn
9  failed to use any alternative method of control of
10 Herkimer, which he did not do, and that that, in my
11 opinion, is a violation of the Loveland Police
12 Department policy and procedure that says that
13 alternate types of control should be considered prior
14 to the use of deadly force against a dog and, if
15 feasible, allow the owner -- Grashorn made no attempt
16 to use anything other than his firearm.
17       From the moment that Bubba stands up, he
18 draws his firearm.  As soon as Bubba stands up and
19 starts to move, you can see in his body camera that he
20 only draws his firearm.  Nothing else.  He doesn't
21 backpedal.  I cannot tell if he's using voice command
22 or not, but he does not attempt to use anything else.
23       And to me, that is against the letter and
24 apparently, or at least how I read it, the intent of
25 both the Colorado Dog Protection Act and the policy of

James Crosby
February 07, 2023

1  the Loveland Police Department.
2      Q.   Okay.  And it says, If feasible, allow
3  the owner of the dog the opportunity to remove the dog
4  from the area.
5      A.   Yeah.
6      Q.   So Officer Grashorn didn't shoot Bubba;
7  correct?
8      A.   No, he didn't shoot Bubba.
9      Q.   And Officer Grashorn allowed the owner
10  the opportunity to call Bubba?
11      MS. SCHIELKE:  Object to form.
12      A.   Apparently it appears that the owner
13  called Bubba.  I don't know if he called Herkimer.  I
14  don't know that Grashorn allowed him to call Bubba.  I
15  know that he simply appears to have issued some kind
16  of direction and Bubba followed.
17      Q.   (BY MR. ABRAMSON) Okay.  And Bubba was
18  called, responded, and was not shot; correct?
19      A.   Correct.
20      Q.   Would it be fair to say that when
21  Officer Grashorn shot Herkimer, Herkimer was running
22  at Officer Grashorn?
23      MS. SCHIELKE:  Object to form.
24      A.   Actually, Herkimer was running to
25  Officer Grashorn's left, if you watch, which is why

1  Officer Grashorn was able to shoot Herkimer in the
2  left side of his head, because Herkimer was to
3  Grashorn's left.  He was not approaching directly
4  frontally.
5      Q.   (BY MR. ABRAMSON) Does Officer Grashorn
6  have to wait to be bit by a dog and suffer injury
7  before he uses deadly force to protect himself?
8      MS. SCHIELKE:  Object to form.
9      A.   No.  At least he -- I'm not aware of any
10  policy within the Loveland Police Department that
11  states that.  There are police departments that
12  actually do require that.  I don't know.
13      Q.   (BY MR. ABRAMSON) And in opinion No. 2
14  you say, Grashorn approached the plaintiffs and their
15  dogs.  He made no effort to initiate or prepare for a
16  less lethal encounter with either dog.
17      A.   Correct.
18      Q.   How should he have been -- if he didn't
19  see a dog, how should he have been prepared for an
20  interaction with a dog?
21      MS. SCHIELKE:  Object to form.
22      A.   Well, if you go back to when he first
23  exits, number one, the dog Bubba is laying in the
24  middle of the parking lot, not invisible.  And then he
25  stands up.  So at the moment that Bubba sat up and

1  became obviously what looks like a dog laying there,
2  Grashorn could have easily and efficiently withdrawn
3  his baton with his lead hand, still leaving himself
4  the option of using his strong or shooting hand to
5  operate his firearm if a lethal threat had appeared.
6      Q.   (BY MR. ABRAMSON) Okay.  In opinion No. 3
7  towards the middle you say, "Thus, based on Grashorn's
8  own statements, it was improper and incorrect for
9  Grashorn to claim that he perceived Herkimer as
10  aggressive.  Grashorn should have clearly perceived
11  Herkimer as non-threatening, or at the very least as
12  presenting minimal risk of injury."
13      What do you mean by "minimal risk of
14  injury"?
15      A.   Minimal risk of injury means that, for
16  instance, dogs typically that do run at people, even
17  if they are doing so in a more offensive manner than
18  Herkimer was, will come to a position and stop to see
19  the reaction.
20      So, for instance, in the postal service,
21  in package delivery services, for electric workers,
22  they are taught that if a dog comes towards them, stop
23  because the dog, more likely than not, will stop and
24  there won't be any contact.  If there is, the dog may
25  nip at pants leg or something and retreat to see what

1  comes next.
2      So had he simply stopped where he was,
3  especially if he had stopped and opened up his
4  collapsable baton, which makes a distinct noise, it's
5  very likely that Herkimer would have never closed the
6  distance to him even if his intentions were friendly.
7      Q.   Okay.  So it's your position that he
8  should have waited to see whether he was friendly or
9  whether he was going to get bit or not before
10  deploying lethal force?
11      MS. SCHIELKE:  Object to form.
12      A.   He should have seized the time to prepare
13  and enable himself to use less lethal force before
14  committing to lethal force.
15      Q.   (BY MR. ABRAMSON) You mentioned the term
16  "garden variety" encounter with a dog.  What do you
17  mean by that?
18      A.   Where do I say that?  I want to make sure
19  I'm reading correctly.  Do you recall where that line
20  is?
21      Q.   I don't.  I didn't put a -- I'll find it
22  for you.
23      A.   Yeah.
24      Q.   If you go to the exhibit, page 13 of 28
25  in the second paragraph of opinion 3.

James Crosby
February 07, 2023

Page 142

1    A.   Okay.  Thank you.  I'm sorry.  I'm still
2  not seeing it.  There's opinion 3.  Under opinion 3 it
3  starts with "Grashorn reports in his deposition (page
4  71)."
5    Q.   Right.  Go to the next paragraph, "The
6  video reveals this to have been a garden variety."
7    A.   I don't have that line on the report that
8  I'm looking at.  Let me double-check the other report,
9  see if somehow -- okay.  Somehow I may have missed --
10  okay.  Minimal injury.
11    Q.   The video reveals --
12    A.   Okay.  I have it.  The video reveals this
13  to have been a garden variety dog encounter which any
14  reasonable and reasonably trained officer is expected
15  to handle.  What I mean by that is this kind of dog
16  encounter happens heaven knows how many times a day
17  every day in departments all across the country and
18  very rarely does anybody discharge a firearm.
19         So this was not -- this was not a
20  guarddog in a business that had big warning signs up
21  that said "beware of guarddog."  This was not a dog
22  that was acting in any kind of overtly offensive or
23  dangerous manner.  This was a dog running over, like
24  dogs do everyday, to say hello to a new person.
25    Q.   You've had time and spend a lot of time

Page 143

1  in your report kind of dissecting the video and taking
2  screen shots of the video; is that fair to say?
3    A.   Yes.  I've spent quite a bit of time with
4  the video and looking at it from frame to frame.
5    Q.   Including looking at the manner in which
6  the dog was wagging its tail, because we talked a bit
7  about your opinion about an erect wagging tail versus
8  the way that Herkimer was observed to have been
9  wagging his tail in the video; correct?
10    A.   That is correct.
11    Q.   How much time did Officer Grashorn have
12  before he shot the dog?
13         MS. SCHIELKE:  Object to form.
14    A.   Looking at the video, from the time -- if
15  this is run in real time, looking at the difference
16  between -- or the time between when Herkimer turned
17  away from Bubba and started in the direction of
18  Officer Grashorn, I can count easily to three.  One,
19  two, three.
20    Q.   (BY MR. ABRAMSON)  Three seconds.  And you
21  would agree in those three seconds he has a dog
22  running at him and he has people to the right who he
23  has not identified; correct?
24         MS. SCHIELKE:  Object to form.
25    A.   Yes, he has a dog approaching him, and

Page 144

1  yes, there are people standing back there by the
2  truck.
3    Q.   (BY MR. ABRAMSON)  All right.  Let's go to
4  opinion 4.  You say that "Grashorn had no reasonable
5  belief that plaintiffs were about to or had committed
6  any crimes."  What's your basis for saying that?
7    A.   Simple.  They were not doing anything
8  that he could see at that time to indicate that there
9  was probable cause or even reasonable suspicion that
10  they were breaking the law other than the fact that
11  their dogs ran out of the truck.
12    Q.   And the property owner called reporting
13  them trespassing.
14    A.   The property owner called reporting them
15  trespassing, yes, but just simply someone making a
16  call to the police doesn't mean even that they're
17  telling the truth, much less that there's anything you
18  can act on.
19         You have to act on what you observe, what
20  you smell, what you feel, what you hear, and there's
21  nothing to that point that would give me as a
22  reasonable and well-trained police officer any reason
23  to believe that they're doing anything other than
24  hanging out by their truck.  I mean, there's even a
25  picnic table just in front of the truck.  You don't

Page 145

1  know if they're going to have a picnic.
2    Q.   Technical difficulties.  Can you hear me?
3    A.   I can hear you.  It's not on my end.
4    Q.   Great.  All right.
5    A.   Sounds like you're in the bottom of a
6  well, but I can hear you.
7    Q.   What's your basis for believing that he
8  should have done some surveillance before contacting
9  them?
10    A.   Simple matter of experience.  If you've
11  got somebody who somebody else is saying might be
12  doing something illegal, then okay, stop back where
13  you can see and watch for a couple of minutes,
14  especially if you're waiting for backup, which he was
15  doing.
16         Don't go -- you know, the saying is "only
17  fools rush in."  So sit back and watch.  If they're
18  doing something they're going to -- and they notice
19  you, they're going to do something to tip you off that
20  they're up to no good.  If they don't see you, you may
21  see them continue to do something that's up to no
22  good.
23         So just waiting and watching a second, I
24  can't tell you how many cases of simply someone's
25  presence -- that by watching and waiting a few seconds

James Crosby
February 07, 2023

Page 146

1    I've been able to determine far more what was going on
2    than I would if I had immediately approached.
3         Q.    So is it your opinion he should have
4    approached and not gotten out of the car or surveilled
5    from an undetectable location?
6         A.    Well, I don't know how the rest of the
7    parking lot and the street is set up, but if, for
8    instance, there was a place across the street where he
9    simply could have pulled over and watched, that would
10   have been a super idea.
11        Pulling maybe into the edge of the
12   parking lot and even if he wanted to get out of his
13   car and stand behind it like he was doing something,
14   he could take the time.  And I'm sure it was not a
15   situation that time was of the absolute essence.
16        He could have easily taken the time to,
17   A, observe the situation, which is what we're taught,
18   is to watch before you go in, and it would have
19   allowed him to -- allowed his backup to arrive so it
20   would have been even safer for both of them.
21        Q.    Do you think this incident would have
22   occurred had Herkimer been on a leash?
23        MS. SCHIELKE:  Object to form.
24        A.    If Herkimer had been on a leash, he would
25   not have been running free, period.

Page 147

1         Q.    (BY MR. ABRAMSON) Therefore, this
2    incident wouldn't have occurred?
3         A.    I can't guess what would have happened.
4    Someone could have dropped a leash.  Anything could
5    have happened.  All I can say is that if he had been
6    on a leash, he would not have been running loose.
7         Q.    In opinion 5 you say that Grashorn
8    blatantly exceeded his authority, knowledge, and
9    training by temporarily denying plaintiffs an ability
10   to take Herkimer for medical care.
11        A.    Yes.  He made -- with no experience and
12   training, he made a decision illustrated by his
13   statement, Ma'am, you're not going to be able to help
14   him, that Herkimer was already beyond being able to be
15   helped.  He is not a veterinarian, as far as I know.
16   So he had no business deciding for the people that
17   their dog was irretrievably wounded.
18        Q.    Do you know if this delay exacerbated
19   Herkimer's condition that we already talked about?
20        A.    That would take a veterinary opinion,
21   which again, I'm not a veterinarian.
22        Q.    In opinion 6 you opine that
23   Officer Grashorn should have recognized prior to
24   shooting that there was a lack of a credible threat.
25   What do you mean by that?

Page 148

1         A.    The approach of Herkimer, based on his
2    posture and his movements, did not indicate that this
3    was a dog that was approaching in an offensive manner.
4    It's very different.  For instance, I'm sure
5    Officer Grashorn in his career sometime probably
6    observed a department canine officer deploy and would
7    have seen that that sort of movement, that focus,
8    teeth bared, straight line, solid approach in order to
9    engage the suspect was far different from what
10   Herkimer was showing.
11        So he should have recognized that this
12   was not that sort of a situation.  On top of that,
13   although dog bites happen, serious dog bites, serious
14   injuries are relatively rare and fatalities are almost
15   nonexistent.  I mean, out of 330 million people in the
16   U.S., less than 40 are typically victimized as far as
17   victims of a fatal attack.  That's tiny.  More people
18   are killed by cows.
19        So he should have recognized that this
20   was not -- although there was a possibility that he
21   might have been bitten, even if he had been bitten,
22   the odds of it being anything serious would have been
23   extremely small.  And if he had deployed, for
24   instance, his baton first to gain space between
25   himself and the dog, then there would have been no

Page 149

1    reasonable likelihood of injury.
2         Q.    Okay.  And so let's just say it's three
3    seconds.  In the three seconds you take issue with his
4    evaluation of the credible threat of Herkimer running
5    at him; correct?
6         A.    Well, actually, he had longer than three
7    seconds because he had the time that it took for
8    Herkimer to join up with Bubba, which was probably
9    another three or four seconds, to be able to make the
10   decision that he might need less lethal intervention.
11   And then he had the full three seconds to be able to
12   appreciate Herkimer's body language.
13        And I can tell you that as a result of
14   having taught over 100 police officers now with the
15   LEDET training program that when I show the video of
16   the dog approaching in a nearly identical manner to
17   Herkimer, the video is 1.7 seconds long and the
18   officers can make their decision shoot or don't shoot
19   within approximately a half a second.
20        So three seconds is plenty of time to
21   recognize the difference between that police canine
22   that's bent down, focused, and coming at you like a
23   bullet and Herkimer bouncing like a goofball across
24   the parking lot.
25        Q.    You said this is in your video

James Crosby
February 07, 2023

1   presentation?
2        A.   Yes.  It's in the DOJ-approved training.
3   And the total length of video is 1.7 seconds, and the
4   officers are typically responding in half to
5   three-quarters of a second.
6        Q.   Well, if we can't get that online, is
7   that something that you can provide to Ms. Schielke?
8        A.   That's what I said earlier.  If you can't
9   get it online, I'll be more than happy to send it to
10  counsel so she can share it with you.
11       Q.   Okay.  Are tasers generally effective on
12  dogs?
13       A.   Absolutely.
14       Q.   Have you ever --
15       A.   In fact, the National Animal Control
16  Association recommends tasers strongly as a defensive
17  measure against dogs.
18       Q.   And what's your understanding of how the
19  deployment of a taser -- not a drive stun, but the
20  firing of a taser works?
21       A.   The taser discharges two darts, one
22  carried above the other, and the two darts spread -- I
23  believe Grashorn mentioned that it's 1 foot for every
24  8 feet, but recognizing that to use against a dog a
25  taser -- in fact, the taser company even explains that

1   you turn the taser on the side so that you get the
2   spread of the two darts left to right instead of up
3   and down.  Extremely effective.  I've got video and
4   also personal experience in seeing animals, dogs and
5   others, flee immediately from getting the pulse from
6   the taser.
7        Q.   Okay.  But you've never fired a taser at
8   a dog?
9        A.   No.  I've never fired a taser at a dog,
10  but I was standing next to a police officer who fired
11  the taser at a different wild pig that was charging
12  us.  And 200-pounds plus of wild boar levitated in the
13  air and turned around and ran, hit the water, and
14  continued swimming faster than I've ever seen a pig
15  move in my life.
16       Q.   But it's fair to say you need to hit both
17  prongs for a taser to be effective?
18       A.   Yes, you do, just like with a person.
19       Q.   All right.  And we already talked that OC
20  spray is very effective; correct?
21       A.   Yes, it's very effective, which has also
22  been proven by studies, including the Baltimore Police
23  Department.
24       Q.   But Officer Grashorn didn't have that
25  option; correct?

1        A.   Apparently he did not.  Apparently
2   Loveland lets the officers choose what they carry,
3   which is kind of crazy.
4        Q.   And he didn't have a catchpole, to your
5   knowledge, either?
6        A.   No.  I've seen no mention of him having a
7   catchpole.
8        Q.   Did plaintiffs do anything wrong in this
9   incident?
10       A.   They didn't have their dog on a leash.
11       Q.   Do you recall a case of -- I'll spell
12  it -- C-r-i-s-c-u-o-l-o versus Grant County, Eastern
13  District of Washington?
14       A.   Yes.  Criscuolo versus Grant County
15  occurred in Moses Lake, Washington.
16       Q.   What happened in that case?
17       A.   That was the case that I mentioned before
18  that it was initially dismissed by the Court.  The
19  attorney refiled the case.  The Court reaccepted the
20  case.  We went to trial and Criscuolo, the plaintiff,
21  was successful and the Grant County, slash, Moses Lake
22  Police Department, whatever the actual entity was, had
23  to pay a substantial amount of damages.
24            If you don't mind, can we take a few
25  minutes so I can take a restroom break?

1            MR. ABRAMSON:  Yeah.  Why don't we take
2   ten.  I'm almost done here.
3            THE DEPONENT:  All I need is a couple of
4   minutes.  I can be right back.
5            MR. ABRAMSON:  Let's break until
6   4 o'clock.
7            (Recess taken, 3:54 p.m. to 4:01 p.m.)
8        Q.   (BY MR. ABRAMSON) You mentioned before
9   that you believe Officer Grashorn should have
10  conducted some surveillance prior to approaching them.
11  Is there a policy you can point to to support that
12  proposition or some sort of training that you can
13  point to?
14           MS. SCHIELKE:  Object to form.
15       A.   I can tell you that I was taught in as
16  far back as the police academy and tactics classes and
17  every bit of police training I've ever had that
18  instead of rushing into something, you should take a
19  second and watch and see what's going on.
20           I know that in cases that I have worked
21  regarding dog shootings where departments did not
22  exercise the practice of looking at what was going on
23  before they went crashing in some place that those
24  tended to come out not necessarily in their favor
25  because they didn't have the information necessary.

James Crosby
February 07, 2023

1   So all through my career, my training
2   officers, my classes I went to, everything always said
3   that if you have the opportunity, unless somebody is
4   dying right now, hold off a second.  And it doesn't
5   have to be long, you know, four or five seconds.
6        You can gain a lot of information by just
7   simply looking at what's going on.  By rushing in too
8   fast, there's no telling whether there was a third
9   subject that Grashorn didn't see that might have come
10  out from doing something evil in the building there.
11      Q.   (BY MR. ABRAMSON) Okay.  So you mentioned
12  the training you received when you were a police
13  officer.  Can you point to any policies or training
14  that Officer Grashorn received at Loveland?
15      A.   I'm not aware of any policies or training that say
16  you should stop.  I don't know what they teach in
17  their academy.  Again, I do know that having been a
18  police officer for many, many years and knowing a lot
19  of police officers since then and being around
20  officers and training them and teaching and working
21  with them, that's a principle that is -- I think it's
22  almost one of those that's so obvious that it doesn't
23  even need to be an official policy that you look
24  before you leap.
25      Q.   Okay.  To be clear, you can't point to

1   any Loveland police academy or any training that
2   Officer Grashorn received?
3        MS. SCHIELKE:  Object to form.
4        A.   Not that I know of.
5        Q.   (BY MR. ABRAMSON) Okay.  Do you believe
6   that this PoliceOne training is good training?
7        A.   I believe there is better out there.  It
8   is better than no training.  It is better than some of
9   the trainings that are out there that I have seen that
10  actually recommend irresponsible and dangerous
11  behavior.
12      Q.   Okay.
13      A.   I'm not going to say that my training is
14  the perfect, best of all because that would be my ego
15  talking.  It's not bad.
16      Q.   Okay.  But you would agree that this is
17  what appears to be the training that Officer Grashorn
18  received?
19      A.   Yes, it does appear to be the training
20  that he received.  And, again, it's not bad.  It does
21  explain things, like the use of less and nonlethal
22  force as a first choice, and it does explain not using
23  breed as some way -- or perceived breed as being some
24  way of guessing what a dog is going to do.
25      Q.   Okay.  You're a big opponent of breed

1   bans; correct?
2        A.   I'm opposed to banning dogs based on
3   appearance.  I do believe that dangerous dogs need to
4   be highly regulated and eliminated when we can, but
5   that dangerous dogs are not defined by appearance.
6        Q.   Okay.  And you have been an expert in
7   cases which have challenged the breed bans?
8        A.   Yes, I have.
9        Q.   Specifically pit bulls?
10      A.   Yes, because that's the most common group
11  of dogs that tend to be banned.  Although, for
12  instance, in the UK there are a couple of other
13  breeds, including a Japanese breed called a Tosa,
14  that's not even remotely like a pit bull, but it's
15  still banned in the UK.  And I still disagree with
16  their dangerous dog act that bans that breed, among
17  others.
18      Q.   Would you agree that pit bulls were
19  originally bred to be a fighting breed?
20      MS. SCHIELKE:  Object to form.
21      A.   It appears that that is true, that the --
22  that in the past a root dog that is through whatever
23  somehow connected to what we commonly call pit bulls
24  now was established for dogfighting, along with
25  several other breeds.  There are also still to this

1   day -- and I have met and evaluated a lot of them.
2   There are still pit bull dogs that are used for
3   unlawful or illegal dogfighting.
4        Q.   (BY MR. ABRAMSON) Would you agree that
5   pit bulls have a higher pain tolerance than other
6   breeds?
7        MS. SCHIELKE:  Object to form.
8        A.   The scientific research in my experience
9   says no.  Pit bulls that are used for illegal
10  fighting, however, are treated by their owners with
11  analgesics and other substances before fights to
12  prevent them from feeling pain, but that's human
13  intervention.  That's pharmacological application of
14  substances to keep them able to fight longer.
15      MR. ABRAMSON:  Let me take a few minutes,
16  see if I have any further questions.  If we can take
17  about another -- we'll go to 4:15 and see if I have
18  anything else.
19      MS. SCHIELKE:  Okay.
20      (Recess taken, 4:08 p.m. to 4:12 p.m.)
21      MR. ABRAMSON:  Mr. Crosby, I don't have
22  any further questions.
23      MS. SCHIELKE:  I have a few really quick.
24
25

James Crosby
February 07, 2023

```
 1              EXAMINATION
 2   BY MS. SCHIELKE:
 3        Q.   Earlier you were asked that if Herkimer
 4   was called, you agree he did not respond to voice
 5   command.  Do you remember that?
 6        A.   Yes.
 7        Q.   Just so I can understand the foundation
 8   of that comment, did you see any evidence in the video
 9   suggesting that Herkimer was called or when he was
10   called?
11        A.   No.  He just -- Bubba turned and went
12   toward the people in the truck and Herkimer continued
13   bouncing along.
14        Q.   If Herkimer was called, do you think --
15   and I guess we have no idea when this hypothetical
16   calling happened, but if he was called, did you see
17   any evidence that Officer Grashorn permitted Herkimer
18   time to respond to the command?
19        MR. ABRAMSON:  Object to foundation.
20        A.   No.  If Herkimer was called at the time
21   he and Bubba went in different directions, then
22   expecting him to immediately respond, especially
23   considering he was a young dog, is a little much.
24        Q.   (BY MS. SCHIELKE) And what do you mean by
25   "a little much"?
```

```
 1        A.   I would not expect a young, relative
 2   puppy of Herkimer's age to be trained to the standard
 3   of an adult several-year-old dog that's been trained
 4   for a period of time.  Puppies tend to be goofy.
 5        Q.   You were asked -- or actually, before I
 6   leave off of that one, if a dog that looked like
 7   Herkimer did, and as we see him on this video, didn't
 8   immediately stop in his tracks to somebody calling him
 9   once, is that something that you would say is an
10   indication the dog is aggressive?
11        MR. ABRAMSON:  Object to form.
12        A.   Not at all.  Not at all.
13        Q.   (BY MS. SCHIELKE) Why not?
14        A.   Because it indicates to me that it's very
15   likely a young dog that's just not been trained
16   completely yet.
17        Q.   What indications do you see on this video
18   that Herkimer was going to bite Grashorn?
19        A.   Absolutely none.  His body posture is
20   loose.  His tail is wagging freely.  His ears are
21   bouncing up and down because his gait, rather than
22   being a direct approach like a missile, is bouncing
23   along.  There's no indication that his hackles are
24   raised.  And the video is pretty clear there.  He's
25   not baring his teeth at all.  His mouth is pretty much
```

```
 1   closed.
 2        A signature behavior that's missing is
 3   what's called an "agonistic pucker."  That's when the
 4   dog withdraws the filtrum, the tissue between the nose
 5   and the lip, and exposes the front teeth.  That's an
 6   extremely valid display of aggressive behavior.  None
 7   of that exists looking at the video.  He's just
 8   bouncing up, literally bouncing as he approaches.
 9        Q.   In the training that you provide, or in
10   the training that at least it seems that Grashorn is
11   saying he did, did you see any -- is there any
12   training that lines up with this video to suggest
13   Herkimer was going to bite?
14        MR. ABRAMSON:  Object to form.
15        A.   None that I've seen, and that includes
16   the training I've developed, the PoliceOne training,
17   the Nevada training, the California POST training, and
18   the Chicago Safe Humane training.
19        Q.   (BY MS. SCHIELKE) Is there anything
20   unusual about a dog running towards a new person to
21   greet them?
22        MR. ABRAMSON:  Object to form.
23        A.   Not at all.
24        MR. ABRAMSON:  Foundation.
25        A.   Not at all.  It's very common.  I
```

```
 1   mentioned before affiliative behavior.  That is
 2   behavior that is common in domestic dogs, because
 3   they're described as a gregarious, affiliative
 4   creature.  In other words, they like hanging out in
 5   groups and they like hanging out with people.  So
 6   they're very social, and it's very common for dogs to
 7   want to run up and say hello to people.
 8        Q.   (BY MS. SCHIELKE) Counsel several times
 9   was trying to ask you questions suggesting that
10   Herkimer was running at Officer Grashorn.  Is that how
11   you would characterize his gait?
12        A.   No.  As I've said, Herkimer, if you watch
13   the video, is actually literally bounding up and down,
14   which is extremely common in affiliative, positively
15   oriented dogs that are soliciting contact and play.
16        Yes, he was going in the same direction
17   as Officer Grashorn was located, but when you say
18   running at someone, again, if I can refer to the
19   common example that pretty much everybody has seen of
20   a police dog that's acquired its target, it's like a
21   missile.  It comes straight.  It doesn't bounce.  It
22   doesn't veer.  It goes straight like a bullet at its
23   target.
24        Herkimer was not doing that.  Herkimer
25   flipped.  He bounced.  He came -- you know, he didn't
```

James Crosby
February 07, 2023

Page 162

1  cross over to the other side, but he was not showing
2  that sort of predatory targeting behavior.
3      Q.  Are you aware of any training -- dog
4  training anywhere in the country for law enforcement
5  that directs officers or otherwise authorizes them to
6  shoot a dog that they find off leash that approaches
7  them?
8      A.  There is a statute in Washington state
9  that allows police officers to shoot any loose dog
10 that is not wearing a metal tag on a collar.  That is
11 the only law, policy, or practice anywhere in the
12 country that I am aware of that encourages, allows,
13 recommends, or even suggests that police should be
14 shooting at dogs just because it's loose.
15     Q.  Okay.  Everywhere else the answer is no?
16     A.  To the best of my knowledge, that's
17 correct.  Everywhere else it's no.
18     Q.  You were asked does Officer Grashorn have
19 to wait to be bit to use deadly force.  Do you
20 remember that question?
21     A.  Yes, I do.
22     Q.  Based on your reading of what the
23 policies are and laws are here and your law
24 enforcement experience, do you think that
25 Officer Grashorn needed to wait for something else by

Page 163

1  way of aggression indicator before he could use deadly
2  force?
3          MR. ABRAMSON:  Object to form;
4  foundation.
5      A.  I believe that Officer Grashorn should
6  have had some indication of dangerous or aggressive
7  behavior beyond the nonthreatening behavior that
8  Herkimer showed before he elected to go to deadly
9  force and that best practices would have been to not
10 only have that additional information or evidence that
11 there was some kind of an aggressive encounter, but
12 that he had also at least tried to do something with a
13 less lethal means which he had on him.
14     Q.  (BY MS. SCHIELKE) So I'm understanding
15 you're not just saying that there were no indications
16 of aggressive behavior or likely aggressive behavior
17 with Herkimer, but even further on the spectrum that
18 there were behavioral indications that Herkimer was a
19 friendly dog.  Am I understanding that correctly?
20         MR. ABRAMSON:  Object to form.
21     A.  That is correct.
22     Q.  (BY MS. SCHIELKE) And those indications
23 that a dog is likely to be friendly that you observed
24 are the same behavioral indications that were in that
25 PoliceOne training that this officer purported to have

Page 164

1  completed?
2      A.  Yes.
3      Q.  If Herkimer had been on a leash, is that
4  a guarantee that Grashorn wouldn't have shot him?
5          MR. ABRAMSON:  Object to form and
6  foundation.
7      A.  No.  It simply means that he would have
8  been on a leash.  That's all it would have
9  established.
10         MS. SCHIELKE:  I don't have anything
11 else.  So I'll pass.
12         MR. ABRAMSON:  I don't have any
13 follow-up.
14         THE REPORTER:  And I just have Exhibit 21
15 marked.  Ms. Schielke, would you like to order the
16 transcript?
17         MS. SCHIELKE:  Sure.
18         THE REPORTER:  Is electronic okay for
19 you?
20         MS. SCHIELKE:  Yes, it is.
21         WHEREUPON, the within proceedings were
22 concluded at the approximate hour of 4:24 p.m. on the
23 7th day of February, 2023.
24         *    *    *    *    *    *
25

Page 165

1          I, JAMES CROSBY, do hereby certify that I
2  have read the above and foregoing deposition and that
3  the same is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5
          Amendments attached   (  ) Yes    (  ) No
6
7
   _____
8
   JAMES CROSBY
9
10
11
12         The signature above of JAMES CROSBY was
13 subscribed and sworn to or affirmed before me in the
14 county of _____, state of Florida, this
15 _____ day of _____, 2023.
16
17
18
   _____
19     Notary Public
      My commission expires
20
21
22
23
24
25 Wendy Love, et al. 2/7/23 (tdg)

Page 166

```
 1                   REPORTER'S CERTIFICATE
 2  STATE OF COLORADO        )
                             ) ss.
 3  COUNTY OF ARAPAHOE       )
 4          I, TIFFANY D. GOULDING, Registered
    Professional Reporter and Notary Public ID No.
 5  19984028637, State of Colorado, do hereby certify that
    previous to the commencement of the examination, the
 6  said JAMES CROSBY verbally declared his testimony is
    under the penalty of perjury in relation to the
 7  matters in controversy between the parties hereto;
    that the said deposition was taken in machine
 8  shorthand by me at the time and place aforesaid and
    was thereafter reduced to typewritten form; that the
 9  foregoing is a true transcript of the questions asked,
    testimony given, and proceedings had.
10
            I further certify that I am not employed
11  by, related to, nor of counsel for any of the parties
    herein, nor otherwise interested in the outcome of
12  this litigation.
13          IN WITNESS WHEREOF, I have affixed my
    signature this 21st day of February, 2023.
14
15      My commission expires November 4, 2026.
16  x____ Reading and Signing was requested.
17  _____ Reading and Signing was waived.
18  _____ Reading and Signing is not required.
19
20
    _____
21          Tiffany Goulding
            Registered Professional Reporter
22
23
24
25
```

Page 167

```
 1  Errata Sheet
 2
 3  NAME OF CASE: VIDEOTAPED OF: WENDY LOVE January 11 vs OFFICER MATHEW GRASHORN
 4  DATE OF DEPOSITION: 02/07/2023
 5  NAME OF WITNESS: James Crosby
 6  Reason Codes:
 7      1. To clarify the record.
 8      2. To conform to the facts.
 9      3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25          _____
```